IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. 12-2591-JWL |
| UBS SECURITIES, LLC, et al., | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. 12-2648-JWL |
| CREDIT SUISSE SECURITIES (USA) LLC, et al., | ) ) ) | |
| Defendants. | ) | |
| _____ | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff National Credit Union Administration Board brings these related suits

as conservator and liquidating agent of credit unions.  The suits relate to a number of

offerings involving different residential mortgage-backed securities ("RMBS" or

"certificates") purchased by the credit unions.  Plaintiff asserts claims under federal and

state law against sellers, underwriters, and issuers for the certificates, based on alleged

untrue statements or omissions of material facts relating to each certificate.[1]

The cases presently come before the Court on the various motions relating to defendants' loss causation affirmative defense.  As more fully set forth herein, the Court rules as follows:

Plaintiff's motion for summary judgment (Doc. # 442 in Case No. 12-2591; Doc. # 401 in Case No. 12-2648) as it relates to that defense is **granted in part and denied in part**.  The motion is granted with respect to defendants' assertion of loss causation as a defense to the California and Kansas statutory claims.  The motion is denied with respect to the federal statutory claims.

Plaintiff's motion (Doc. # 385 in Case No. 12-2648) to exclude testimony by William Goetzmann, Credit Suisse's loss causation expert, and plaintiff's motion (Doc. # 421 in Case No. 12-2591) to exclude testimony by William Greene, UBS's loss causation expert, are **granted in part and denied in part**.  The motions are granted with respect to those experts' opinions relying on their regression analyses that employed certain benchmark samples, and any such testimony is precluded.  The motions are otherwise denied.

Plaintiff's motion (Doc. # 425 in Case No. 12-2591) to exclude testimony relating to loss causation by Andrew Carron, UBS's damages expert, is **denied**.

---

[1]The Court refers to the defendants in Case No. 12-2591 collectively as "UBS". The Court refers to the defendants in Case No. 12-2648 collectively as "Credit Suisse".

Defendants' motion to exclude (Doc. # 430 in Case No. 12-2591; Doc. # 396 in Case No. 12-2648) as it relates to testimony by plaintiff's loss causation experts, James Barth and Anthony Saunders, is **granted in part and denied in part**.  The motion is granted with respect to any opinion by Dr. Saunders that subordination levels would have been higher but for the particular misrepresentations alleged in these cases.  The motion is otherwise denied.

## I.   Plaintiff's Motion for Summary Judgment

### A.   *Governing Standards*

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006).  An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way."  *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).  A fact is "material" when "it is essential to the proper disposition of the claim."  *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v.*

3

*Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon the pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### B.    *California and Kansas Statutory Claims*

As a defense to plaintiff's federal and state statutory claims, each defendant asserts that some or all of plaintiff's damages were not caused by the alleged misrepresentations and omissions.  By a single motion filed in both cases, plaintiff seeks summary judgment on the loss causation defenses.

4

Plaintiff first argues that an absence of loss causation is not a valid defense to its California and Kansas statutory claims.  Sections 11 and 12 of the federal Securities Act explicitly recognize the absence of loss causation as an affirmative defense.  *See* 15 U.S.C. §§ 77k(e), 77*l*(b).  The relevant California and Kansas statutes, however, do not explicitly recognize a loss causation defense.  Section 25401 of California's Corporate Securities Law (CCSL) provides:

> It is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

*See* Cal. Corp. Code § 25401.  Section 25501 of the CCSL provides:

> Any person who violates Section 25401 shall be liable to the person who purchases a security from him . . ., who may sue either for rescission or for damages (if the plaintiff . . . no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission.  Upon rescission, a purchaser may recover the consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security, upon tender of the security.  . . .  Damages recoverable under this section by a purchaser shall be an amount equal to the difference between (a) the price at which the security was bought plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received on the security by the plaintiff.  . . .

*See id.* § 25501.  Section 509(b) of the Kansas Uniform Securities Act (KUSA) provides:

> A person is liable to the purchaser if the person sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make a statement made, in light of the

5

circumstances under which it is made, not misleading, the purchaser not knowing the untruth or omission and the seller not sustaining the burden of proof that the seller did not know and, in the exercise of reasonable care, could not have known of the untruth or omission.  An action under this subsection is governed by the following:

> (1)    The purchaser may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest from the date of the purchase . . ., costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages as provided in paragraph (3).

> (2) . . .  A purchaser that no longer owns the security may recover actual damages as provided in paragraph (3).

> (3)  Actual damages in an action arising under this subsection are the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest from the date of the purchase . . ., costs, and reasonable attorneys' fees determined by the court.

K.S.A. § 17-12a509(b).  Thus, although these statutes explicitly recognize some defenses (the purchaser's knowledge, the defendant's reasonable care, the defendant's lack of knowledge), they do not explicitly require a showing of causation or recognize as a defense the absence of loss causation.

Defendants argue that these state statutes impliedly allow for a loss causation defense, although defendants do not rely on any particular language in the statutes to support that argument.  Rather, defendants argue that because the federal analogue to these statutes allows for such a defense, these statutes should be interpreted also to allow for the defense.  The Court rejects this argument.

The parties agree that the California and Kansas statutes were modeled after

6

Section 12 of the federal Securities Act.  *See Viterbi v. Wasserman*, 123 Cal. Rptr. 3d 231, 238 (Cal. Ct. App. 2011); *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 934 (1991) ("the Kansas Securities Act was patterned after the Uniform Securities Act that, in turn, copied the Federal Securities Act of 1933") (citing Section 12 of the Securities Act); *Enneking v. Schmidt Builders Supply Inc.*, 917 F. Supp. 2d 1200, 1209 (D. Kan. 2013) (in 2004, Kansas Securities Act was repealed and replaced by the Uniform Securities Act).  By the Private Securities Litigation Reform Act of 1995 (PSLRA), Congress amended Section 12(b) (at that time, denominated Section 12(2)) to add an explicit loss causation defense.  *See* 15 U.S.C. § 77*l*(b).  Neither California nor Kansas enacted similar amendments to the statutes at issue here, however.

Defendants argue that the California and Kansas statutes should nevertheless be interpreted to include an implied loss causation defense because Section 12 impliedly included such a defense even before its amendment in 1995.  The Supreme Court has effectively rejected such an interpretation of Section 12, however.  In *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), the Court noted that although one purpose of Section 12(2)'s rescission remedy was to restore the plaintiff to its original position, Congress also intended "to deter prospectus fraud and encourage full disclosure."  *See id.* at 659. The Court stated:  "Indeed, by enabling the victims of prospectus fraud to demand rescission upon tender of the security, Congress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud."  *See id.* (citations omitted).  Thus, the Supreme Court interpreted Section

12(2) not to allow for the assertion of an absence of loss causation as a defense.  *See, e.g.*, *Casella v. Webb*, 883 F.2d 805, 808-09 (9th Cir. 1989) (citing *Randall* in rejecting a lack-of-causation argument under Section 12(2) pre-amendment).

Defendants argue that the Supreme Court was mistaken in concluding that Congress did not intend to allow a loss causation defense under Section 12(2). Defendants cite legislative history of the 1995 amendment to that statute, which contains a statement that the amendment was intended to "clarify" that the absence of loss causation may be raised as an affirmative defense.  *See* S. Rep. No. 104-98, at 23, 1995 U.S.C.C.A.N. 679, 702 (1995).  Defendants also cite a statement from the 1930s by the FTC Commissioner, relating to a proposed amendment to the recently-enacted Section 12(2) to add a causation element, that the addition of that element would not change the meaning of Section 12(2) as originally enacted.  The Supreme Court has made clear, however, that "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation."  *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (citations omitted).  Thus, the Court will not attempt to discern Congress's original intent in enacting the Securities Act in 1933 based on a vague reference to a clarification made in 1995 or a statement from someone not in Congress regarding an amendment that was never enacted—especially when the proposed interpretation conflicts with the Supreme Court's gloss on Congress's intent in enacting Section 12(2).[2]

---

[2]In addition, as one court has noted, the drafter of the Securities Act of 1933 did
(continued...)

Moreover, defendants have not cited a single case in which the court interpreted the pre-amendment Section 12(2) to include an implied loss causation defense.  Thus, the Court cannot conclude that the highest courts in California and Kansas, if faced with the question, would conclude that Section 12(2) did impliedly contain such a defense.  *See FHFA v. HSBC N. Am. Holdings Inc.*, 988 F. Supp. 2d 363, 369 (S.D.N.Y. 2013) (rejecting the same argument in support of a loss causation defense under Virginia and D.C. statutes).  Accordingly, there is no basis to recognize an implied loss causation defense under the California and Kansas statutes.

The actual text of the statutes further undermines defendants' proposed interpretation.  Those statutes do not merely fail to include an explicit loss causation defense; they also provide that a successful purchaser plaintiff is entitled either to rescission or to damages calculated in a specific way that does not account for any possible changes in value unrelated to the alleged misrepresentation or omission.  *See* Cal. Corp. Code § 25501; K.S.A. § 17-12a509(b).  Thus, the statutes provide only for relief that conflicts with a loss causation defense.

Moreover, the Court's rejection of defendants' interpretation of the California statutes is consistent with cases in which courts (including the Third Circuit and the Ninth Circuit) have stated that liability under those statutes does not require any proof

---

[2](...continued)

not believe that it contained a loss causation element.  *See In re Countrywide Fin. Corp. Mtge.-Backed Sec. Litig.*, 2014 WL 12324284, at *3 n.8 (C.D. Cal. Dec. 9, 2014) (quoting Felix Frankfurter, *The Federal Securities Act II*, Fortune, Aug. 1933, at 108).

of causation. *See Bowden v. Robinson*, 136 Cal. Rptr. 871, 878 (Cal. Ct. App. 1977) (statutes differ from common-law negligent misrepresentation because, *inter alia*, no proof of causation is required); *Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 224 (3d Cir. 2002) (citing *Bowden*); *Brady v. Dairy Fresh Prods. Co.*, 974 F.2d 1341 (Table), 1992 WL 223765, at *5 (9th Cir. Sept. 9, 1992) (unpub. op.) (citing *Bowden*); *Cutler v. Rancher Energy Corp.*, 2014 WL 1153054, at *10 (C.D. Cal. Mar. 11, 2014) (citing *Bowden*); *Swain v. Beard*, 2013 WL 6795069, at *1, 27 (S.D. Cal. Dec. 19, 2013) (adopting report and recommendation in which magistrate judge contrasted California statutes to Section 12(b)'s explicit loss causation defense); *Nutracea v. Langley Park Invs. PLC*, 2007 WL 135699, at *2 n.2 (E.D. Cal. Jan. 16, 2007) (citing *Bowden*); *In re R.E. Loans LLC*, 519 B.R. 499, 516 (Bankr. N.D. Tex. 2014) (citing *Bowden*).

Similarly, in one case from this district, the court noted that the only causation element contained in the predecessor to Section 509(b) of the KUSA relates to materiality of the misrepresentation or omission. *See Comeau v. Rupp*, 810 F. Supp. 1127, 1158 (D. Kan. 1992). Defendants note that in three other cases from this district the court seemingly included causation as an element of a cause of action under section 509(a) or its predecessor. *See Ames v. Uranus, Inc.*, 1993 WL 106896, at *14 (D. Kan. Mar. 17, 1993) (Lungstrum, J.); *Simmons Invs., Inc. v. Conversational Computing Corp.*, 2011 WL 673759, at *4, 6 (D. Kan. Feb. 17, 2011); *Wood v. LP Conversions, Inc.*, 2016 WL 715772, at *6 (D. Kan. Feb. 22, 2016). None of those three cases contains any reasoning or analysis relating to loss causation, however, that would support defendants'

position.  In *Simmons*, the court listed the elements of a claim under Section 10(b) of the federal Securities Exchange Act, including that the plaintiff suffered damages as a result of reliance on the misleading statements; denied a motion to dismiss that claim, without considering the causation element; stated that the elements under Section 509(b) "are essentially the same" as the elements under federal Section 10(b) (citing only to the two statutes), without restating those elements; and then summarily denied the motion to dismiss the state statutory claim for the same reasons stated with respect to the federal claim.  *See Simmons*, 2011 WL 673759, at *4-6.  In *Wood*, the court simply relied on the *Simmons* court's listing of Section 10(b) elements in naming the elements for a claim under Section 509(b), although the court did not consider the loss causation element, as it granted summary judgment to the defendants under one of the other elements.  *See Wood*, 2016 WL 715772, at *6 (citing *Simmons*).  In *Ames*, the court listed the elements for a federal Section 10(b) claim, including damages sustained as a proximate result of the misrepresentations; dismissed Section 10(b) claims against certain defendants, based on the conclusion that the plaintiff had failed to plead with particularity how the alleged misrepresentations proximately caused the damages; and ruled that the plaintiff's claims under K.S.A. § 17-1268(a) (the predecessor to Section 509(b)) were subject to dismissal for the same pleading deficiencies, including the failure to plead adequately that the loss was caused by the alleged misrepresentations.  *See Ames*, 1993 WL 106896, at *5-6, 14.  Like the courts in *Wood* and *Simmons*, however, the court in *Ames* was not asked to analyze whether causation was actually a required element of proof for liability under

the Kansas statute.

The absence in those three cases of any analysis on the availability of a loss causation defense robs those cases of any persuasive value. Moreover, application of the Section 10(b) elements to a Kansas statutory claim—as done by those three courts without analysis—would not be appropriate here for at least two reasons: it is undisputed that the Kansas statute is modeled after (and thus more analogous to) Section 12 of the Securities Act; and the federal and state statutes are materially different, as the Securities Exchange Act explicitly requires proof of loss causation by the plaintiff in a Section 10(b) action. *See* 15 U.S.C. § 78u-4(b)(4). Thus, prior cases from this district do not compel or suggest an interpretation of Section 509(b) that would allow for a loss causation defense.

Finally, as plaintiff notes, courts considering similar Blue Sky statutes from other states have similarly rejected loss causation defenses. *See, e.g.*, *FHFA v. HSBC*, 988 F. Supp. 2d at 367-70 (Virginia and D.C. statutes); *NCUAB v. Morgan Stanley & Co.*, 2014 WL 1673351, at *3-6 (S.D.N.Y. Apr. 28, 2014) (Illinois and Texas statutes). In contrast, defendants have not identified any cases reaching the opposite result.

In summary, the Court declines defendants' invitation to read a defense into the California and Kansas statutes that would be inconsistent with their express terms. Accordingly, the Court concludes that defendants may not assert the absence of loss causation as a defense to plaintiff's claims under those statutes, and the Court grants plaintiff's motion for summary judgment to that extent.

### C.      *Lack of Expert Evidence*

With respect to the federal claims, plaintiff argues that the opinions of defendants' loss causation experts should be excluded, for reasons set forth in plaintiff's *Daubert* motions, and that defendants therefore cannot offer sufficient evidence to support this defense.  As set forth below, however, the Court has not excluded defendants' loss causation expert testimony in its entirety.  Accordingly, the Court denies plaintiff's motion for summary judgment on this defense as it relates to the federal claims.

## II.     **Plaintiff's Motions to Exclude Expert Testimony**

Credit Suisse has disclosed William Goetzmann as it loss causation expert.  UBS has disclosed William Greene as its loss causation expert, and its damages expert, Andrew Carron, has also offered opinions relating to loss causation.  Plaintiff seeks to exclude various opinions relating to loss causation offered by these three experts.

### A.      *Governing Standards*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court instructed that district courts are to perform a "gatekeeping" role concerning the admission of expert testimony.  *See id.* at 589-93; *see also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999).  The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training,

13

or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In order to determine that an expert's opinions are admissible, this Court must undertake a two-part analysis: first, the Court must determine that the witness is qualified by "knowledge, skill, experience, training, or education" to render the opinions; and second, the Court must determine whether the witness's opinions are "reliable" under the principles set forth in *Daubert* and *Kumho Tire*. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). The rejection of expert testimony is the exception rather than the rule. *See* Fed. R. Evid. 702 advisory committee notes. The district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *See Kumho Tire*, 536 U.S. at 152.

## B. *Composition of Benchmarks*

Plaintiff seeks to exclude opinions by Dr. Goetzmann and Dr. Greene that are based on analyses employing benchmark groups. Those experts have opined that they conducted regression analyses that indicated that certain macroeconomic factors and loan characteristics—factors other than the misrepresentations and loan defects alleged in these cases—caused any losses to the certificates. In performing those analyses, Dr. Goetzmann and Dr. Greene predicted the performance of the loans underlying these

14

certificates based on the performance of benchmark groups of other comparable loans that did not involve these defendants.  The experts also confirmed their results by running their analyses with small subsets of their original benchmark groups, which they formed by removing all loans securing certificates involved in litigation.

Plaintiff argues that because these experts made no attempt to remove from the benchmarks any loans that suffer from the same defects alleged in these cases, the benchmarks cannot be considered valid control groups, and the experts' opinions based on the regression analyses must therefore be excluded as unreliable.  In *FHFA v. Nomura Holding America, Inc.*, 2015 WL 539489 (S.D.N.Y. Feb. 10, 2015), a case very similar to these cases, Judge Cote excluded opinions based on a similar regression analysis for this same reason.  *See id.*  In response to plaintiff's argument, defendants have not disputed that, as a fundamental scientific principle, a clean control group—i.e., a group free of the defect that the analysis is attempting to exclude as a cause—is necessary for a reliable analysis.  *See id.* at *5 ("Indeed, it is axiomatic that, when designing an experiment to test whether an observed result was caused by [a] given variable, the control or benchmark group must lack that variable.") (citing authorities supporting the need for a clean control group).  Nor have defendants disputed that their experts did not try to control for the variable of defective loans in their analyses.  In fact, the experts testified that there may be defective loans in their benchmark groups.  Nevertheless, defendants make four arguments against exclusion, which the Court addresses in turn.

1.  Defendant UBS makes the following summary argument:

> As a threshold matter, [plaintiff] does not and cannot contend that the alleged misrepresentations or omissions in *this* case were included in Dr. Greene's Industry Benchmarks because he excluded loans underlying any RMBS securitizations underwritten or issued by UBS, including the Trusts, from both of his industry benchmarks. For this reason alone, [plaintiff's] assertion that the benchmarks are inadmissible evidence to measure whether the actual misrepresentations alleged caused the losses falls apart.

(Citation and footnote omitted.) The Court rejects this argument, as it is not enough for the subject loans to have been omitted from the benchmarks. By definition, the subject loans cannot properly be compared with a group that also includes those loans. The purpose of these analyses, however, is to support the defense that factors other than the alleged misrepresentations and defects caused the losses in value here. If other loans suffered from similar defects found in the subject loans, then a comparison using those other loans could not determine whether factors other than the defects caused the losses. Dr. Greene conceded in his deposition that, although his benchmarks would be adequate control groups if the treatment of the analysis were UBS underwriting, if the treatment were instead materially misrepresented loans, the control group would need to exclude misrepresented loans. Here, the relevant inquiry concerns loans subject to particular misrepresentations; but those misrepresentations could not be distinguished as a cause if loans subject to the same or similar misrepresentations were not omitted, whether or not those loans involved these same defendants or these same certificates. Thus, it was not sufficient for Dr. Greene simply to have excluded loans involving UBS. Plaintiff has not shown how these benchmark groups may serve as proper bases for comparison

without the elimination of defective loans.

2.      Defendants also note that their experts' alternate benchmarks excluded loans from certificates involved in litigation.  Defendants and their experts argue that those alternate analyses confirmed the results from the analyses using the original benchmarks, but defendants have not argued that the smaller samples were in fact sufficiently clean with respect to the presence of defective loans.  The experts testified that they used the alternate benchmarks to counter expected criticism that they had not removed loans subject to litigation.

Even if defendants had argued that the exclusion of loans involved in litigation cured the problem identified by plaintiff, the Court would reject that argument.  The experts could not testify that the smaller benchmarks were sufficiently free of defective loans.  Dr. Greene testified that he did not perform any test to determine whether the absence of litigation is a reliable predictor of compliance with underwriting guidelines, and that he simply presumed that fewer misrepresented loans would be included if loans involved in litigation were excluded.  Dr. Goetzmann conceded in his testimony that the absence of litigation was not a clear proxy for a lack of defects, and he refused to express an opinion as to whether the absence of litigation is an accurate predictor of compliance.  In *FHFA*, Judge Cote rejected an argument for admission based on a smaller benchmark, noting that "[e]xcluding loans that have been the subject of lawsuits may be a good start for creating a clean benchmark, but it does little to ensure the quality of the loans remaining in the group."  *See id.* at *7.  The Court agrees that there is no basis here to

17

conclude that the removal of loans subject to litigation is a sound method for eliminating defective loans from the benchmarks groups. Defendants' experts could not confirm that such removal would result in the necessary elimination of defective loans, and in fact the experts made no attempt to eliminate such loans from the benchmarks.

3.     Despite their experts' concessions that their benchmarks may contain defective loans, defendants complain that plaintiff and its experts can only speculate that the benchmark groups actually do contain defective loans. Defendants take issue with the evidence that plaintiff's expert cites on that question. The burden is on defendants, however, to establish the reliability of their experts' opinions. *See United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). Thus, it is not incumbent upon plaintiff to show that the benchmarks include defective loans. Rather, plaintiff has properly pointed out that defendants' experts did not control for the key variable and that their methodology is therefore unsound. It may be true, as Judge Cote noted in *Nomura*, that "[d]ue to the apparent prevalence of these loan defects, it may have proved difficult to create a clean benchmark set of loans to use as a control group." *See Nomura*, 2015 WL 539489, at *7. That difficulty, however, does not relieve defendants of their burden to show that their experts used a reliable methodology in conducting their regression analyses.[3]

Credit Suisse argues that plaintiff does bear the burden in challenging its expert's

---

[3]Like the expert in *FHFA*, *see* 2015 WL 539489, at *6, defendants' experts did not use re-underwriting results to select a set of compliant loans to use as a benchmark.

analysis, and that plaintiff therefore cannot merely speculate that the expert's benchmarks include defective loans. The cases cited by Credit Suisse from the Ninth Circuit, however, do not support that conclusion. In *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002), for example, the expert accounted for key variables in his analysis, and thus the court could not conclude that the analysis was too incomplete to be admissible; and thus the Ninth Circuit concluded that opposing party could not merely rest on unsubstantiated assertions of error with respect to the failure to account for other variables. *See id.* at 1188-89 (citing *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986)). Thus, if defendants' experts had conducted proper regression analyses that accounted for the most important variables, plaintiff would be required to show that the failure to consider a particular variable actually affected the result. In this case, however, the experts did not attempt to control for the key variable. That failure is fatal, regardless of whether plaintiff can establish that the benchmarks did contain defective loans (the possibility of which defendants' experts conceded). The Court therefore rejects this argument by Credit Suisse.

4.      Finally, defendants argue that any issue concerning the failure of their experts to eliminate defective loans from their benchmarks goes to the weight of the experts' opinions and not to the opinions' admissibility. Defendants cite *Bazemore v. Friday*, in which the Supreme Court stated that "[n]ormally, failure to include variables will affect the analyis' probativeness, not its admissibility." *See* 478 U.S. at 400. The Supreme Court followed that statement, however, by noting that "[t]here may, of course,

19

be some regressions so incomplete as to be inadmissible as irrelevant." *See id.* at 400 n.10.  The failure to control for the very issue being tested would render a regression analysis incomplete; thus, such failure in this case makes any opinion based on the faulty analysis inadmissible.  In *Nomura*, Judge Cote rejected the argument that this flaw does not warrant exclusion, as follows:

> This idea is so fundamental that, unsurprisingly, there are few cases in which a court has been forced to exclude an expert study because the expert was unable to demonstrate that the control group lacked the very variable requiring isolation.  There are, however, multiple examples of courts excluding experts whose analyses fail to account for significant variables.  If the failure to account for other potential variables can suffice to doom an expert's study, it follows that the failure to control for the one variable under review warrants exclusion.

*See Nomura*, 2015 WL 539489, at *5 (citations omitted) (citing cases).[4]  Defendants have not cited any case in which the court held that the failure to control for the variable being tested affected only the weight of the evidence and not its admissibility.

Defendants do cite antitrust cases in which an expert was permitted to rely on a regression analysis despite the parties' dispute concerning whether the expert's benchmark period might have been tainted by anticompetitive behavior.  In those cases, however, the expert was able to articulate a basis for his benchmark decision.  *See, e.g.*, *In re Urethane Antitrust Litig.*, 2012 WL 6681783, *5-6 (D. Kan. Dec. 21, 2012) (Lungstrum, J.), *aff'd*, 768 F.3d 1245 (10th Cir. 2014).  In the present cases, if

---

[4]UBS has addressed *Nomura* only in a footnote, arguing that Judge Cote did not consider all of the authorities it has cited here.  Incredibly, Credit Suisse failed to address *Nomura* at all.  The Court finds *Nomura* persuasive on this issue.

defendants' experts had employed a reliable method in an attempt to eliminate defective loans from the benchmarks, any criticisms of that method would go to the weight of the opinions. The experts made no such attempt in these cases, however. For instance, the experts did not testify that a benchmark group could validly include some number of defective loans; nor did they propose any standard for determining how many such loans a valid benchmark group could include.[5] Thus, defendants have not articulated any basis on which the Court, as gatekeeper, might allow the jury to consider the experts' analyses.

In the absence of a sound methodology for excluding defective loans from the benchmark groups, the Court must conclude that defendants have not met their burden to show that their experts' opinions that depend on their regression analyses are sufficiently reliable. Accordingly, the Court excludes any expert testimony by Dr. Greene or Dr. Goetzmann that depends on their regressions analyses that employed the benchmark groups discussed herein, and plaintiff's motion is granted to that extent.

### C.    *Relatedness of Other Causes*

Plaintiff also challenges all three experts' opinions concerning other causes of the loss in value of the certificates at issue in these cases (i.e., causes other than the misrepresentations and omissions alleged by plaintiff here). Plaintiff argues that any such opinions are inadmissible because the other causes identified by the experts were not unrelated to the loan and underwriting defects that were the subject of the alleged

---

[5]In opposition to the motion to exclude, defendants did not submit any affidavits in which their experts addressed these questions.

misrepresentations.

Defendants' experts opine that certain macroeconomic factors caused a market-wide financial crisis that ultimately caused any losses to the certificates. *See Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 n.2 (2d Cir. 2015) ("when a 'plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiffs' loss was caused by the fraud' is lessened") (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005)). In arguing that the Court should exclude those opinions, plaintiff relies on *FHFA v. Nomura Holding America, Inc.*, 104 F. Supp. 3d 441 (S.D.N.Y. 2015), *appeals pending*, Nos. 15-1872, 15-1874 (2d Cir.), which involved similar claims based on similar alleged misrepresentations. In *Nomura*, Judge Cote concluded that to prevail on its loss causation defense, "a defendant must carry its burden of showing that the loss in the value of the securities at issue was proximately caused by events unrelated to the subject of the alleged misrepresentations." *See id.* at 585-86. Judge Cote then concluded that the defendants in that case had not carried that burden, in part because they failed to dispute the evident link "between the securitization frenzy associated with those shoddy [origination] practices and the very macroeconomic factors that they say caused the losses to the Certificates." *See id.* at 587.

Defendants in the present cases argue that Judge Cote's "unrelated" standard from *Nomura* is not consistent with the statutory loss causation provisions. The Court need not decide that issue at this time, however, because even under the *Nomura* standard, the

relatedness of the alleged misrepresentations and the underlying loan practices to the macroeconomic factors identified by defendants' experts presents a question of fact for trial. Indeed, Judge Cote reached her conclusions regarding the assertion of the loss causation defense in *Nomura* only after a trial on the merits. Thus, *Nomura* does not provide a basis for exclusion of these experts' loss causation opinions.

The Court also rejects plaintiff's argument that the relatedness opinions stated in the experts' reply reports should be excluded because they were not disclosed in the experts' original reports. Those opinions address the criticisms by plaintiff's loss causation expert concerning defendants' experts' opinions that other factors caused the losses here, and the Court does not believe that such opinions were improperly included in the reply reports. Moreover, even if the reply opinions could be considered new and thus improper, plaintiff waived any such objection by failing to raise the issue by motion within 30 days of the reply report. *See* D. Kan. 37.1(b). Finally, plaintiff had the opportunity to explore any bases for the reply opinions in the experts' depositions, and plaintiff has not identified particular opinions that its own expert would have offered in rebuttal, nor has plaintiff requested leave to supplement its expert's disclosure. Accordingly, plaintiff has not shown sufficient prejudice to warrant exclusion of these opinions under Rule 37, and the Court denies the motion to exclude defendants' experts' opinions on this basis.

D.   *Additional Arguments Relating to Dr. Goetzmann*

The Court also rejects plaintiff's other arguments for exclusion of Dr.

23

Goetzmann's opinions. Plaintiff argues that Dr. Goetzmann only analyzed whether other factors caused the losses, and thus he did not undertake the necessary analysis of whether the alleged misrepresentations and omissions caused the losses. In his report, however, Dr. Goetzmann did opine that the misrepresentations did not cause the losses, based on his opinion regarding the other causes. Moreover, even if Dr. Goetzmann did not offer an opinion on the alleged misrepresentations, his opinions concerning other causes would nonetheless be relevant to Credit Suisse's defense.

The Court also rejects plaintiff's argument that Dr. Goetzmann improperly considered only losses to the underlying loans, as opposed to losses to the value of the certificates based on those loans. Plaintiff's case is premised on alleged misrepresentations concerning the underlying loans. Thus, evidence that loan defaults were caused not by bad underwriting but by other factors could be relevant and helpful to the determination of the cause of the losses to the certificates. The Court denies plaintiff's motion to exclude testimony by Dr. Goetzmann to the extent based on these arguments.

E.    _Additional Arguments Relating to Dr. Carron_

Finally, the Court rejects plaintiff's additional arguments relating to Dr. Carron's loss causation opinions. Plaintiff argues that those opinions would not be helpful to the jury because Dr. Goetzmann did not rely on those opinions in forming his own opinions concerning the proper amount of damages in this case, and because Dr. Goetzmann did not try to quantify the amount of loss caused by other factors. Although the party

asserting an absence of loss causation—UBS, in this case—may be required to apportion the causes to some degree, plaintiff has not cited any authority requiring an attempt at quantification by each and every expert offering an opinion that may be relevant to the question of loss causation.  UBS is relying on loss causation opinions by another expert, Dr. Greene, and Dr. Carron's opinions may be relevant and helpful to UBS's and the jury's attempts to apportion the causes of the losses in this case.

The Court also rejects plaintiff's argument that, in his loan performance data analysis, Dr. Carron has merely assumed, without support, that loan performance would otherwise be similar across different states.  Dr. Carron testified that various factors supported that assumption in this case.  The Court further rejects plaintiff's argument that such testimony should be disregarded because those statements may not be found in Dr. Carron's initial report.  Again, plaintiff had the opportunity to ask about those bases in Dr. Carron's deposition, and plaintiff has not identified specific prejudice or requested supplementation of its own expert disclosures.  The Court therefore denies in its entirety the motion to exclude Dr. Carron's loss causation opinions.

### III.     Defendants' Motion to Exclude

Defendants have filed a joint motion to exclude testimony offered by various experts retained by plaintiff, including testimony by plaintiff's loss causation rebuttal experts, James Barth and Anthony Saunders.  With the exception of one new argument concerning Dr. Barth, defendants seek exclusion on the same bases argued in this Court

by Nomura, a defendant in a similar case brought by plaintiff (which case was resolved before the Court ruled on Nomura's motions to exclude testimony by these experts).[6]

A.     *Dr. Barth*

Defendants seek to exclude testimony by Dr. Barth.  The Court denies this motion.

1.     Defendants first seek to exclude any opinions by Dr. Barth that misrepresentations and loan defects—both generally in the industry and specifically in these cases—contributed to the financial crisis and macroeconomic factors that defendants' experts cite as causes of losses to the certificates here.  With respect to Dr. Barth's opinions concerning "generic" misrepresentations or defects, defendants argue that any effect from misrepresentations other than those alleged in these cases is irrelevant.  The Court rejects that argument, as it concludes that such evidence could be relevant in these cases to rebut any contention by defendants (who bear the burden of proof) that the losses were caused by factors independent of the alleged misrepresentations.

As noted above, in *Nomura* Judge Cote required the defendants to show that the losses were caused by events unrelated to the phenomena underlying the misrepresentations alleged in that case—that is, caused by events unrelated to bad origination practices generally.  *See Nomura*, 104 F. Supp. 3d at 587-89.  Under that

---

[6]Both sides have incorporated by reference the briefs relating to Nomura's motions to exclude.

standard, Dr. Barth's testimony regarding the effect of generic misrepresentations and defects would clearly be relevant.  Even if the Court does not apply the same standard in this case (an issue that the Court does not decide at this time), the Court cannot say that the evidence could not be relevant as a basis for considering the effect on the market of the specific misrepresentations at issue here.  Defendants argue that the loans at issue in these cases are simply too few in number to have affected the entire market (an argument rejected by Judge Cote, *see id.* at 589); the Court cannot decide that issue as a matter of law, however.  Thus, the Court denies the motion to exclude opinions regarding the impact of generic misrepresentations.

The Court also rejects defendants' argument for exclusion of Dr. Barth's opinions regarding the impact of the specific misrepresentations and defects at issue in these cases.  Dr. Barth opined that those defects had at least some "nonzero" impact on the market and thus on the financial crisis.  Defendants argue that Dr. Barth did not conduct any analysis specific to these misrepresentations and loans, that his opinions are therefore unsupported and speculative, and that he failed to quantify any such impact.  Dr. Barth did cite support for his opinion regarding the impact of generic defects, however, and that opinion supports his opinion that the defects in these cases had at least some impact.  Moreover, the Court concludes that such testimony may be helpful to the jury's determination of whether other factors caused the losses here.  In particular, if the other causes cited by defendants were not entirely independent of the alleged misconduct, that fact could be relevant to the consideration of the loss causation defense.

Plaintiff is under no obligation to quantify any such impact, as defendants bear the burden to show causation by other factors; thus, Dr. Barth's opinions may be relevant even if he cannot estimate how much impact the specific defects had on the market or on the losses to the certificates.  Accordingly, the Court denies the motion to exclude such opinions.

2.     Defendants also seek to exclude Dr. Barth's opinion that the alleged misrepresentations in these cases contributed to the increase in delinquencies and defaults in the underlying loans by facilitating loans to borrowers who were more likely to default if housing prices declined.  The Court, however, rejects defendants' argument that that opinion is unsupported, as Dr. Barth did cite support for his general opinion that such misrepresentations do increase the likelihood of default, which opinion he applied in this case.  Defendants also argue that Dr. Barth, who relied on the re-underwriting opinions of another expert, is impermissibly parroting the other expert without adding any opinion of his own.  The Court rejects that argument for exclusion at this time, as that issue is better judged at trial in the context of the actual testimony by the two experts.  Defendants are free to challenge Dr. Barth's testimony at trial on this basis as appropriate.

3.     Finally, in a new argument not raised by Nomura in its case, defendants argue that Dr. Barth's opinions should be excluded because he failed to distinguish between loan defects (attributable to third-party originators) and the disclosure defects allegedly caused by defendants.  The Court denies the motion for exclusion on this basis.

28

Plaintiff's theory is that defendants' disclosures were defective because of the underlying loan defects. Thus, the two types of defects are not unrelated, and Dr. Barth has sufficiently rendered an opinion that defendants' disclosure defects caused the losses to the value of the certificates. Again, the Court notes that defendants bear the ultimate burden to apportion the potential causes of the losses. Accordingly, the Court denies in its entirety defendants' motion to exclude expert testimony by Dr. Barth.

### B.    *Dr. Saunders*

Defendants seek to exclude various opinions by Dr. Saunders, for the same reasons argued by Nomura in its case in this Court. First, defendants' motion to exclude Dr. Saunders's opinions relating to the benchmarks used by defendants' experts is denied as moot, in light of the Court's exclusion of those experts' analyses utilizing those benchmarks.

Defendants also seek to exclude opinions by Dr. Saunders concerning the impact of the alleged misrepresentations on the certificates' subordination levels. That motion is granted in part and denied in part. Defendants argue that the Court should exclude both Dr. Saunders's affirmative opinion that the subordination levels would have been higher but for the alleged misrepresentations and his criticism of defendants' experts for failing to address any impact on subordination levels in assessing loss causation. Defendants argue that Dr. Saunders failed to consider the actual certificates in this case and did not conduct any analysis of the effect of the alleged misrepresentations on these certificates' subordination levels. Defendants further argue that Dr. Saunders is not

29

qualified to offer any such opinion in light of his concessions that he did not have access to the ratings agencies' models and that he did not know the details of how the agencies reached their conclusions.

In responding to Nomura's motion in the related case, plaintiff stated that Nomura had mischaracterized Dr. Saunders's opinions and that Dr. Saunders did not opine that the alleged misrepresentations in that case would have increased the subordination levels required by the ratings agencies.  Plaintiff's brief in the present cases does not include a similar disclaimer, but plaintiff has not directly addressed defendants' argument that any such affirmative opinion should be excluded (arguing instead that Dr. Saunders was entitled to criticize defendants' experts' opinions).  In fact, in each case, Dr. Saunders' report contain the same affirmative opinion, as follows:

> If the Offering Documents had made truthful disclosures concerning the characteristics of the At-Issue loans (including the underwriting practices used to originate them), the subordination levels of the At-Issue loans likely would have been higher, which would have provided the Credit Unions with greater protection against losses.

Plaintiff has not cited any reliable basis for that opinion, and the Court agrees that such testimony would be improper, in light of the concessions that Dr. Saunders did not conduct any analysis of the certificates at issue in these cases and that he in fact lacked access to the information required for such an analysis.  Accordingly, the Court concludes that plaintiff has not shown that any affirmative opinions by Dr. Saunders concerning the impact of misrepresentations on subordination levels for these certificates are sufficiently reliable, and the Court grants the motion to exclude such opinions.

The Court denies the motion, however, with respect to Dr. Saunders' criticism of defendants' experts for their failure to consider the effect on subordination levels.  As plaintiff notes, defendants bear the burden to establish an absence of loss causation, and plaintiff's expert may properly rebut the opinions by defendants' experts, including by identifying potential flaws in those experts' methodologies.  The Court rejects defendants' argument that any testimony by Dr. Saunders relating to subordination levels is impermissibly speculative.  It is *not* speculative for Dr. Saunders to note that defendants' expert did not consider a key factor relating to the value of the certificates. Moreover, Dr. Saunders did cite bases for his general opinions concerning the impact that representations concerning loan characteristics may have on subordination levels. Thus, Dr. Saunders's criticisms of defendants' experts are not unsupported.

The Court also rejects defendants' argument that Dr. Saunders lacks sufficient qualifications to render any opinions on this subject.  Dr. Saunders has impressive qualifications supporting his knowledge of this market, and the Court concludes that those qualifications are sufficient for him to testify generally concerning the relationship between misrepresentations concerning loan characteristics and subordination levels (whether or not he would be qualified to analyze whether the levels were affected in this case).  Therefore, the Court denies the motion as it relates to Dr. Saunders's criticism of defendants' experts for their failure to consider the effect on subordination levels.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiff's motion for

summary judgment (Doc. # 442 in Case No. 12-2591; Doc. # 401 in Case No. 12-2648) is **granted in part and denied in part** to the extent related to loss causation. The motion is granted with respect to defendants' assertion of loss causation as a defense to the California and Kansas statutory claims, and plaintiff is awarded judgment on those defenses. The motion is denied with respect to loss causation as a defense to the federal statutory claims. The motion otherwise remains pending.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiff's motion (Doc. # 385 in Case No. 12-2648) to exclude testimony by William Goetzmann and plaintiff's motion (Doc. # 421 in Case No. 12-2591) to exclude testimony by William Greene are **granted in part and denied in part**. The motions are granted with respect to those experts' opinions relying on their regression analyses that employed certain benchmark samples, and any such testimony is precluded. The motions are otherwise denied.

IT IS FURTHER ORDERED THAT plaintiff's motion (Doc. # 425 in Case No. 12-2591) to exclude testimony by Andrew Carron is **denied** to the extent related to loss causation. The motion otherwise remains pending.

IT IS FURTHER ORDERED THAT defendants' motion to exclude (Doc. # 430 in Case No. 12-2591; Doc. # 396 in Case No. 12-2648) is **granted in part and denied in part** to the extent related to testimony by James Barth and Anthony Saunders. The

motion is granted with respect to any opinion by Dr. Saunders that subordination levels would have been higher but for the particular misrepresentations alleged in these cases. The motion is otherwise denied as it relates to those expert witnesses. The motion remains pending as it relates to other expert witnesses.

IT IS SO ORDERED.

Dated this 20th day of December, 2016, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge