IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, )<br><br>Plaintiff, )<br>v. )<br><br>UBS SECURITIES, LLC, et al., )<br><br>Defendants. )<br>_____) | Case No. 12-2591-JWL |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, )<br><br>Plaintiff, )<br>v. )<br><br>CREDIT SUISSE SECURITIES (USA) LLC, )<br>et al., )<br>Defendants. )<br>_____) | Case No. 12-2648-JWL |

## MEMORANDUM AND ORDER

Plaintiff National Credit Union Administration Board brings these related suits as conservator and liquidating agent of credit unions.  The suits relate to a number of offerings involving different residential mortgage-backed securities ("RMBS" or "certificates") purchased by the credit unions.  Plaintiff asserts claims under federal and state law against sellers, underwriters, and issuers for the certificates, based on alleged

untrue statements or omissions of material facts relating to each certificate.[1]

The cases presently come before the Court on the various motions relating to plaintiff's damages.  As more fully set forth herein, the Court rules as follows:

Defendants' motion for partial summary judgment relating to damages (Doc. # 445 in Case No. 12-2591; Doc. # 407 in Case No. 12-2648) is **denied**.  The Court rejects defendants' argument concerning the treatment of post-complaint principal payments in calculating damages under Section 11.  The motion is denied as premature with respect to issues relating to prejudgment interest.

Plaintiff's motions to exclude testimony by Andrew Carron, UBS's damages expert (Doc. # 425 in Case No. 12-2591), and to exclude testimony by Christopher James, Credit Suisse's damages expert (Doc. # 391 in Case No. 12-2648), are **granted in part and denied in part**.  The motions are granted with respect to those experts' deductions of post-complaint principal payments in determining damages under Section 11 in the event that the NGN transactions are found not to have been dispositions, and such testimony shall be excluded.  The motions are otherwise denied.[2]

---

[1]The Court refers to the defendants in Case No. 12-2591 collectively as "UBS".  The Court refers to the defendants in Case No. 12-2648 collectively as "Credit Suisse".

[2]By a previous order, the Court denied plaintiff's motion to exclude testimony by Dr. Carron relating to loss causation.

## I.   **Defendants' Motion for Summary Judgment Concerning Damages**

By a joint motion filed in each case, defendants seek summary judgment with respect to the proper calculation of prejudgment interest.  Plaintiff argues that these issues relating to any award by the Court of prejudgment interest should be considered after trial, once it has been determined whether and to what extent plaintiff has been awarded damages.  Plaintiff also notes that an award of prejudgment interest is discretionary with respect to the federal claims.  The Court agrees that consideration of these issues at this time would be premature.  The Court would ordinarily take up any issues relating to prejudgment interest after trial.  Although the Court customarily awards prejudgment interest on a liquidated damage recovery, with the purpose of compensating the plaintiff for the lost use of that money, the Court will of course entertain any arguments concerning whether and how to award interest in this case, and such arguments are better considered once any damages have been determined.  Accordingly, the Court in its discretion denies the motion for summary judgment to the extent that it seeks pretrial rulings relating to prejudgment interest.

Defendants also seek summary judgment on a single issue relating to the proper calculation of damages under Section 11 of the federal Securities Act, 15 U.S.C. §77k.[3] Most of the certificates at issue in these cases were transferred by plaintiff to the NGN

---

[3]Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Trusts.  Plaintiff argues in these cases that those transfers represent dispositions for purposes of determining damages under the relevant statutes, including Section 11.  In the related *RBS* case, the Court denied the parties' cross-motions for summary judgment, ruling that an issue of fact remained for trial concerning whether the NGN transactions constituted dispositions under the statutes.  *See NCUAB v. RBS Sec. Inc.*, 2016 WL 3685210, at *8-9 (D. Kan. July 12, 2016) (Lungstrum, J.).  In these cases, plaintiff's damages expert, John Finnerty, has offered opinions concerning his calculations of damages under Section 11 in the event that the NGN transactions are found not to have been dispositions.  In those calculations, Dr. Finnerty deducted certain repayments of principal received by plaintiff in accordance with the terms of the certificates.[4] Specifically, Dr. Finnerty deducted principal payments received prior to the corresponding dates on which these actions were filed (September 6, 2012, for *UBS*, Case No. 12-2591; October 4, 2012, for *Credit Suisse*, Case No. 12-2648); he did not, however, deduct principal payments received after those dates.  Defendants argue in that event that post-suit principal repayments should be deducted in determining damages

-----

[4]Although plaintiff does not raise the point in the argument section of its opposition brief, plaintiff has stated in its facts section that, after the NGN transactions, any such principal repayments were received by the NGN Trusts and not by plaintiff. If those transactions are found not to have been dispositions, however, then the repayments would be deemed to have been made to plaintiff.  Presumably, that is why Dr. Finnerty made these deductions in calculating damages under this scenario.

under Section 11 as a matter of law, and they seek summary judgment to that effect.[3]

Section 11(e) provides as follows:

The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . .

*See* 15 U.S.C. § 77k(e).  As plaintiff notes, if the security has not been disposed of before or after suit, then Section 11 mandates damages in the amount of the difference between the price paid and the value of the security at suit; thus, the plain language of the statute precludes any deduction for income on the security.  Defendants argue that the text of the statute does allow for consideration of a repayment of principal after suit because such a repayment should be deemed a disposition under Section 11(e)(3) (which, if considered, would lessen the amount of damages).  Defendants note that, according to both sides' experts, a principal repayment has the same economic effect as a sale of part of the security, as the purchaser has received its money back and therefore has not

---

[3]In *RBS*, this Court also ruled that a question of fact remained concerning whether certain Sandlot transactions by the credit unions (for whom plaintiff is acting as liquidator) were dispositions under the statutes.  *See RBS*, 2016 WL 3685210, at *3-8.  The issue discussed herein arises with respect to a certificate only in the event that no pre-suit disposition has been found for that certificate.

5

suffered any loss on the portion of the security represented by the repayment. Defendants argue that a purchaser could ultimately receive a windfall if repayments were not deducted in the damage calculation under Section 11(e).

The Court rejects defendants' argument concerning the interpretation of Section 11(e). The plain language of the statute allows for an alternate measure of damages if "such security shall have been disposed of after suit but before judgment." *See* 15 U.S.C. § 77k(e). It is undisputed that plaintiff has not disposed of these certificates post suit. Thus, there is no basis to interpret the statute to allow for a deduction for post-suit repayments under the certificates. Defendants argue that the repayments are *like* dispositions, but the statute's alternate measure is limited to a disposition of the security. Moreover, the damages provision of Section 12 of the federal Securities Act explicitly allows for a deduction for "any income received thereon." *See* 15 U.S.C. § 77*l*(a). Thus, the Court gives effect to Congress's refusal to provide for a similar deduction under Section 11.

In addition, defendants' proposed interpretation is not required to avoid a windfall from the receipt of post-suit income. Section 11(e) already provides for a deduction of the value of the security at the time of suit (as the plaintiff retains the security), and that value would account for the likelihood and amount of any future income on the security. A plaintiff is allocated the upside if it ultimately recovers more on the security than its value as determined at the time of suit; but that plaintiff also bears the risk that it will not ultimately realize that value on the security. That upside, if realized, does not represent

6

an impermissible windfall that demands that the statute be interpreted in a manner other than in accordance with its plain terms.

The parties have identified only one case in which this issue has been addressed. *See FHFA v. Nomura Holding Am., Inc.*, 68 F. Supp. 3d 486, 494 (S.D.N.Y. 2014) (Cote, J.). In *Nomura*, the court rejected this same argument in granting a motion in limine to exclude evidence of post-suit payments on the certificates at issue there. *See id.* The court noted that the plain text of Section 11 was inconsistent with an offset or deduction for such payments, it pointed out the distinction between the damage provisions of Section 11 and Section 12, and it rejected any argument based on the notion of a windfall (for the same reason set forth above). *See id.* The Court agrees with the reasoning of the court in *Nomura*.

Defendants argue that the *Nomura* court did not address the application of Section 11(e)(3), but as discussed above, that provision's requirement of a disposition of the security is not satisfied here. Defendants also argue that the *Nomura* court did not address the possible inconsistency in deducting for pre-suit payments but not for post-suit payments, as plaintiff's expert has done in this case. Whether pre-suit payments must be deducted is not at issue here, however, as defendants challenge only the failure to account for post-suit payments. Section 11(e) plainly does not allow for a deduction to account for post-suit income, and in the absence of authority supporting such an interpretation, the Court will not interpret the statute to add a component to the damage calculation mandated in explicit terms. The Court therefore denies defendants' motion

for summary judgment with respect to this issue.

## II.     Plaintiff's Motions to Exclude Expert Testimony

By separate motions, plaintiff seeks to exclude certain testimony by defendants' damages experts, Andrew Carron (UBS) and Christopher James (Credit Suisse). Because plaintiff raises the same arguments with respect to both experts, the Court addresses the motions together.

### A.     *Governing Standards*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court instructed that district courts are to perform a "gatekeeping" role concerning the admission of expert testimony.  *See id.* at 589-93; *see also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999).  The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In order to determine that an expert's opinions are admissible, this Court must undertake a two-part analysis:  first, the Court must determine that the witness is qualified by "knowledge, skill, experience, training, or education" to render the opinions;

8

and second, the Court must determine whether the witness's opinions are "reliable" under the principles set forth in *Daubert* and *Kumho Tire*. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). The rejection of expert testimony is the exception rather than the rule. *See* Fed. R. Evid. 702 advisory committee notes. The district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *See Kumho Tire*, 536 U.S. at 152.

### B. *Post-Suit Principal Payments*

Dr. Carron and Dr. James calculated plaintiff's damages under Section 11 under a scenario in which the NGN transactions are found not to have been dispositions. For the same reasons discussed above, plaintiff argues that defendants' experts, in making those calculations, improperly deducted post-suit principal repayments, and plaintiff therefore seeks to exclude any such testimony. Because the Court agrees that Section 11(e)'s damages provision does not allow for a deduction for income received on the security post-suit, as set forth above, the Court grants this potion of plaintiff's motion, and Dr. Carron and Dr. James will not be permitted to offer any opinion by which they deduct such payments under this scenario.

### C. *Determination of the Value of the OTCs*

Plaintiff's remaining challenges to the expert opinions of Dr. Carron and Dr. James relate to their calculations of plaintiff's damages under a scenario in which plaintiff is found to have disposed of certificates in the market in the NGN transactions.

In those transactions, plaintiff in its capacity as liquidator ("NCUA-Liq")—as distinguished from plaintiff acting as an agency in the executive branch of the federal government ("NCUA-Exec")—transferred certificates into the NGN trusts; NCUA-Liq received notes funded by income from the certificates, which NCUA-Liq sold for cash (the "net proceeds"); and NCUA-Liq received Owner Trust Certificates ("OTCs"), which entitled NCUA-Liq to residual income from the certificates once the NGN notes relating to those certificates were fully paid off.  In plaintiff's related case against RBS, the Court ruled as a matter of law that, under the scenario in which the NGN transactions were dispositions, "any calculation of plaintiff's damages must account for all of the assets (the entirety of the net proceeds and the OTCs) received by NCUA-Liq."  *See RBS*, 2016 WL 3685210, at *11.  Plaintiff's expert has not attempted to assign a positive value to the OTCs.  Dr. Carron and Dr. James, however, did opine on the value of the OTCs.  In forming those opinions, defendants' experts relied on a discounted cash flow (DCF) analysis of the OTCs performed by BlackRock, a financial advisor, which analysis plaintiff commissioned and has used for various purposes.

In seeking to exclude the experts' opinions based on the BlackRock DCF analysis, plaintiff first argues that the experts improperly failed to determine a "market value" for the OTCs.  Essentially, plaintiff argues that the value of the OTCs must be determined by reference to the market for such assets, and that because the BlackRock DCF analysis was not intended to determine the "market value" of the OTCs, that analysis may not be used here.

10

The Court rejects this argument for exclusion. Plaintiff does not dispute that a discounted cash flow analysis represents a generally accepted method for valuing an asset. Indeed, plaintiff's expert, Dr. Finnerty, conceded that, if done correctly, a DCF analysis gives an accurate estimation of value. There is no requirement that the value of an asset be determined solely by reference to market prices. For example, the Second Circuit has recognized that "the value of a security may not be equivalent to its market price," that the key is value and *not* market price, and that "[t]he value of a security is not unascertainable simply because it trades in an illiquid market and therefore has no 'actual market price.'" *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165, 167 (2d Cir. 2012) (citing *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995)). Plaintiff concedes that there were no contemporaneous sales of the OTCs or similar assets that could provide market prices for use in valuing the OTCs. The lack of a market does not necessarily mean, however, that the OTCs had no value to NCUA-Liq, and indeed, the possibility of future income suggests that the OTCs did have some value. Thus, defendants' experts reasonably used an alternate method of determining the OTCs' value. Plaintiff is free to argue at trial that the OTCs had no value, but the Court cannot conclude that the lack of a market and the failure to rely on market prices render the experts' OTC valuations unreliable and inadmissible. Notably, plaintiff has not provided any expert evidence suggesting that a DCF analysis could not be used reliably to determine the value of the OTCs.

Plaintiff further argues that any DCF analysis should have been based on multiple scenarios and not on the single scenario from BlackRock used by defendants' experts. The Court concludes that any such criticism bears only on the weight to be afforded the experts' opinions.  Defendants' experts conceded that a multi-scenario analysis is generally used for certain call options, but they did not concede that the use of the BlackRock scenario was not reliable because it was not a multi-scenario analysis.  The experts used BlackRock's "base case" scenario because that scenario was the most likely actually to occur; thus, the experts' decision to use a single scenario was not without basis.  Again, plaintiff has not supported its argument with any expert testimony of its own.  The Court rejects this basis for exclusion.

Finally, the Court rejects plaintiff's argument that the OTCs valuations should be excluded under Fed. R. Evid. 403.  Defendants' experts' valuations are highly probative concerning the value of the OTCs, which make up one part of the total value received by plaintiff in disposing of the certificates; the use of a DCF analysis instead of market prices is not unfairly prejudicial; and the probative value of the evidence is not substantially outweighed by any prejudice from the fact that plaintiff may wish to put on evidence concerning the underlying BlackRock analysis.

### D.    *Reliability of Use of the BlackRock Analysis*

Plaintiff next argues that defendants' experts' use of the BlackRock analysis is not reliable for various reasons.  First, plaintiff argues that the experts did not have access to BlackRock's particular models and did not know all of the assumptions made

12

by BlackRock in performing the DCF analysis of the OTCs, and thus that the experts cannot verify the validity or accuracy of that analysis.  Plaintiff relies on *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993), in which the court held that an expert improperly relied on hearsay in the form of another person's projections where the testifying expert's "lack of familiarity with the methods and reasons underlying [the other person's] projections virtually precluded any assessment of the validity of the projections through cross-examination of [the expert]."  *See id.* at 732-33.  Here, however, plaintiff commissioned the BlackRock analysis and had access to BlackRock's methods and assumptions; thus, plaintiff does not lack the ability to present evidence and to cross-examine defendants' experts to challenge the validity of the BlackRock analysis as it sees fit.

Plaintiff has not cited to any authority suggesting that defendants' experts must be able to replicate the analysis on which they rely; rather, Rule 703 merely requires that the experts reasonably rely on their underlying facts and data.  *See* Fed. R. Evid. 703. In this case, the experts' use of the BlackRock analysis was not without basis, as the fact that plaintiff has used the BlackRock analysis for its own purposes provides some evidence of the validity and reliability of that analysis.  Accordingly, the Court rejects this argument for exclusion.

Second, plaintiff argues that the BlackRock analysis is unreliable for use in valuing the OTCs because the analysis was based in part on data from after the relevant valuation dates, the use of which creates a risk of hindsight bias.  Plaintiff has not

provided any authority, however, suggesting that the use of post-valuation-date evidence makes a valuation so unreliable as to warrant exclusion. The use of such data raises only a potential concern, and a BlackRock witness testified that any such material concern in this case would have been noted. The Court concludes that this criticism by plaintiff bears only on the weight of the opinions and does not provide a basis for exclusion.

Third, plaintiff argues that defendants' experts should have used an analysis employing an investment or market discount rate. The analysis used by the experts, however, employed the same discount rate requested by plaintiff in commissioning the BlackRock analysis. Thus, this decision by the experts was not without basis, and plaintiff's criticism goes only to the weight of the opinions.

Fourth, plaintiff complains that the BlackRock "as of" dates for their analyses are not sufficiently close to the NGN disposition dates. The Court cannot conclude that the dates are so distant as to make the valuations so unreliable as to be inadmissible. Plaintiff may make this argument to the jury concerning the effect of the dates on the accuracy of the valuations.

Fifth, the Court rejects plaintiff's argument that the experts' opinions concerning the value of the OTCs should be excluded because the experts used a more optimistic scenario from the BlackRock analysis (based on different assumptions) than the BlackRock scenario that plaintiff itself has used in its financial reporting. Defendants' experts did not arbitrarily "cherry pick" a favorable scenario, however; rather, they used BlackRock's "base case" scenario because that scenario was the most likely to occur,

and plaintiff's argument that a less optimistic scenario should have been used goes to the weight of the opinions and not to their admissibility.

Sixth, plaintiff faults defendants' experts for failing to use or consider Barclays's analysis in setting up the NGN transactions, which predicted *no* cash flow from the OTCs.  The experts could reasonably have chosen not to use the Barclays analysis, however, based on evidence that the intended goal of the NGN transactions was to set the value of the NGN notes to minimize or eliminate payments by NCUA-Exec on the guarantee, and that the realization of that goal would *increase* the likelihood that there would be residual payments on the OTCs.  That likelihood provides at least a reasonable basis for rejection of the Barclays prediction of no cash flow, and the Court thus concludes that the relevance of the Barclays analysis is for the jury to decide at trial.  The Court thus rejects this basis for exclusion.

### E.    *Method of Allocation*

Plaintiff also argues that defendants' experts' methodologies for allocating the value of the OTCs among the particular certificates at issue are unreliable.  The BlackRock DCF analysis yielded figures for all OTCs in the particular NGN trusts, but those figures were not allocated among particular certificates within those trusts.  Dr. James allocated the OTC figures among certificates in the same proportion that the certificates were valued as a whole by Barclays.  Dr. Carron allocated the OTC figures among certificates in three alternate ways, proportionately based on the Barclays values for the certificates, the BlackRock values for the certificates, and the difference between

the Barclays and BlackRock values for the certificates.

Plaintiff argues that these methods of allocation are not reliable because they are not based on the likely performance of the certificates and thus are not based on the likelihood that there will be any income on the OTCs. The Court rejects this argument as a basis for exclusion. Some allocation of OTC value to the certificates at issue in these cases is necessary, and plaintiff does not dispute that allocation in some relative proportion to some other value is an accepted methodology of allocation.[4] Any criticism that the experts should not have compared the value of the OTCs to the value of the certificates generally may be presented to the jury, and goes to the weight of the experts' opinions and not to their admissibility. Plaintiff argues that the experts' methods result in the overvaluation of some OTCs, but because the total OTC value is being allocated among all certificates in the NGN trusts, there is just as great a likelihood that the OTCs in these cases have been undervalued. Plaintiff has not submitted any evidence from an expert on this issue, and thus there is no basis to assume a high rate of error here. The Court denies the motions to exclude at they relate to this issue.

> F.    _Failure to Account for the Value of the Guarantee_

In the NGN transactions, the NGN notes were backed by a guarantee from NCUA-Exec, for which NCUA-Exec received a fee (from the NGN trusts) and the right

---

[4]Defendants have submitted evidence suggesting that plaintiff similarly allocated projected OTC income among the credit unions in proportion to the value of the certificates.

to seek reimbursement from the trusts for any payments made on the guarantee. Plaintiff argues that the damages calculations under this scenario by defendants' experts should be excluded because they failed to account for the value of that guarantee provided by NCUA-Exec. In *RBS*, the Court effectively rejected this argument. In that case, the Court noted that NCUA-Liq did not pay NCUA-Exec anything for the guarantee, and that NCUA-Liq had given up only the certificates while receiving the net proceeds and OTCs; and the Court thus ruled that "any calculation of damages should be based on the receipt of the entirety of the net proceeds and the OTCs, without any reduction for some value attributed to the guarantee." *See RBS*, 2016 WL 3685210, at *10.

Despite that ruling, plaintiff argues that the experts should have assigned some value to the guarantee in light of their concessions that NCUA-Liq "effectively" did pay something for the guarantee, in the sense that the guarantee fees paid by the trusts reduced the potential income to NCUA-Liq on the OTCs. The Court rejects that argument. As the Court noted in its prior ruling, the trusts paid for the guarantee, and NCUA-Liq received the OTCs. Thus, as the Court ruled, the value of the OTCs is key in determining the value received by NCUA-Liq in disposing of the certificates. Moreover, as defendants point out, their experts' valuations of the OTCs account for the deduction of the fee payments for the guarantee. Thus, defendants' experts properly refused to account for the value of the guarantee in their damage calculations under this scenario, and plaintiff's motions to exclude are denied with respect to this issue.

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' motion for partial summary judgment relating to damages (Doc. # 445 in Case No. 12-2591; Doc. # 407 in Case No. 12-2648) is hereby **denied**.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiff's motions to exclude testimony by Andrew Carron (Doc. # 425 in Case No. 12-2591) and to exclude testimony by Christopher James (Doc. # 391 in Case No. 12-2648) are hereby **granted in part and denied in part**.  The motions are granted with respect to those experts' deductions of post-suit principal payments in determining damages under Section 11 in the event that the NGN transactions are found not to have been dispositions, and such testimony shall be excluded.  The motions are otherwise denied.

IT IS SO ORDERED.

Dated this 30th day of December, 2016, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

18