IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12-2591-JWL |
| UBS SECURITIES, LLC, et al., | ) ) | |
| Defendants. | ) ) | |
| ———————————————— | ) ) | |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12-2648-JWL |
| CREDIT SUISSE SECURITIES (USA) LLC, et al., | ) ) ) | |
| Defendants. | ) ) | |
| ———————————————— | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff National Credit Union Administration Board brings these related suits

as conservator and liquidating agent of credit unions.  The suits relate to a number of

offerings involving different residential mortgage-backed securities ("RMBS" or

"certificates") purchased by the credit unions.  Plaintiff asserts claims under federal and

state law against sellers, underwriters, and issuers for the certificates, based on alleged

untrue statements or omissions of material facts relating to each certificate.[1]

These two cases (hereafter referred to as *UBS* and *Credit Suisse*) presently come before the Court on various motions by plaintiff for summary judgment and to exclude expert testimony.[2]  As more fully set forth herein, the Court rules as follows:

Plaintiff's motion for summary judgment on certain defenses (Doc. # 442 in *UBS*, Case No. 12-2591; Doc. # 401 in *Credit Suisse*, Case No. 12-2648) as it relates to defendants' knowledge defenses and certain of defendants' limitations defenses is **granted**, and plaintiff is awarded judgment on those defenses, as set forth herein.[3]

Plaintiff's motion for summary judgment on UBS's due diligence and reasonable care defenses (Doc. # 435 in *UBS*, Case No. 12-2591) is **granted in part and denied in part**.  Summary judgment is granted against defendant Mortgage Asset Securitization Transactions, Inc. (MASTR) and with respect to the NAA 2006-AR4 securitization.  The motion is otherwise denied.

Plaintiff's motion for summary judgment on Credit Suisse's due diligence and reasonable care defenses (Doc. # 393 in *Credit Suisse*, Case No. 12-2648) is **granted in**

---

[1]Except in Part III of this opinion, the Court refers to the defendants in Case No. 12-2591 collectively as "UBS".  The Court refers to the defendants in Case No. 12-2648 collectively as "Credit Suisse".

[2]The standards governing the Court's consideration of these motions are stated in the Court's prior opinions in these cases by which it ruled on other motions for summary judgment and to exclude expert testimony.

[3]The Court previously granted in part and denied in part this motion as it relates to defendants' loss causation defenses.  *See NCUAB v. UBS Sec., LLC*, 2016 WL 7373857 (D. Kan. Dec. 20, 2016) (Lungstrum, J.).

**part and denied in part**.  Summary judgment is granted against defendant Credit Suisse

First Boston Mortgage Securities Corp. (CSFB) and with respect to the INDYL 2006-L2

securitization.  The motion is otherwise denied.

Plaintiff's motion to exclude expert testimony by Gary Lawrence and Charles

Grice (Doc. # 419 in *UBS*, Case No. 12-2591; Doc. # 383 in *Credit Suisse*, Case No. 12-

2648) is **denied**.


## I.    Summary Judgment – Knowledge

By a single motion filed in both cases, plaintiff seeks summary judgment on any

knowledge defense asserted by defendants.  Section 11 of the Securities Act provides for

a claim by an acquirer of a security based on an untrue statement of material fact or

omission of material fact "unless it is proved that at the time of such acquisition he knew

of such untruth or omission."  *See* 15 U.S.C. § 77k(a).  Thus, Section 11 provides an

affirmative defense of knowledge on which the defendant bears the burden of proof.  *See*

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d

109, 127 n.12 (2d Cir. 2013).  Similarly, the relevant California statute provides for

liability "unless the defendant proves that the plaintiff knew the facts concerning the

untruth or omission."  *See* Cal. Corp. Code § 25501.  Section 12(a)(2) and Kansas law

make the absence of the purchaser's knowledge an element of the plaintiff's claim.  *See*

15 U.S.C. § 77*l*(a)(2) (qualifying the requirements for liability as follows: "the purchaser

not knowing of such untruth or omission"); K.S.A. § 17-12a509(b) (qualifying the

requirements for liability as follows: "the purchaser not knowing the untruth or omission").

The plain language of these statutes requires that the knowledge relevant to this defense be *actual* knowledge of the purchaser, not mere constructive knowledge. *See New Jersey Carpenters Health Fund*, 709 F.3d at 127 n.12 (affirmative defense under Section 11 requires proof of actual knowledge); *MidAmerica Fed. Sav. and Loan Ass'n v. Shearson/American Express, Inc.*, 886 F.2d 1249, 1257 (10th Cir. 1989) (under Section 12, purchaser must prove a lack of actual knowledge); *Comeau v. Rupp*, 810 F. Supp. 1127, 1158 (D. Kan. 1992) (predecessor to Section 12a509(b) focused on the plaintiff's actual knowledge, not constructive knowledge, which interpretation is consistent with that given to federal Section 12); *see also NCUAB v. UBS Sec., LLC*, 2016 WL 7373857, at *3 (D. Kan. Dec. 20, 2016) (Lungstrum, J.) (Kansas statute was modeled after federal Section 12). Defendants do not dispute that this defense under each of the statutes refers to the purchaser's actual knowledge.

In these cases, plaintiff asserts claims based on representations that the underlying loans were originated in compliance with certain underwriting guidelines and representations that the loans had certain characteristics. Under any of these statutes, and whichever party bears the ultimate burden of proof, plaintiff has satisfied its initial summary judgment burden to provide evidence showing an absence of material fact with respect to the credit unions' lack of knowledge of the alleged misrepresentations. For instance, plaintiff has cited testimony from credit union employees to the effect that the

4

credit unions did not know that the offering documents for these certificates contained misrepresentations.  Plaintiff has also cited evidence that the credit unions used offering documents' data regarding the underlying loans for other purposes, which evidence supports a reasonable inference that the credit unions believed the data to be accurate. In seeking summary judgment, plaintiff argues that there is no evidence that the credit unions did have actual knowledge of the alleged misrepresentations concerning the loans underlying the certificates.

In opposition to summary judgment, defendants have not cited any evidence that the credit unions knew that the particular representations concerning the specific pools of loans underlying the certificates were actually false.  Rather, defendants rely on generalized evidence that there were well-known and widespread problems in the industry with respect to the improper origination of loans and the abandonment or loosening of underwriting guidelines and that certain risks were inherent in the purchase of RMBS.  Defendants note that plaintiff itself warned credit unions about these problems, and they cite to media reports and other public information about the problems.  Defendants also cite evidence, for example, that these credit unions were sophisticated, repeat purchasers of RMBS; performed their own reviews of originators, which revealed underwriting issues; understood the origination process and the need for verification of information from the borrowers; knew that defendants' and the underwriters' due diligence analyses did not involve every loan; were aware of the trends regarding bad underwriting by originators and the loosening of underwriting standards;

and appreciated the risk of borrower misrepresentations and fraud with respect to the certificates they purchased. Defendants argue that such circumstantial evidence gives rise to a reasonable inference that the credit unions had actual knowledge of the misrepresentations alleged here.

The Court disagrees, and it concludes that defendants' evidence is not sufficient to create a genuine issue of material fact concerning the credit unions' actual knowledge that the representations concerning specific loans were actually false. The statutes tie the required knowledge of the purchaser to the particular misrepresentations and omissions alleged by the plaintiff. Indeed, defendants concede in their opposition brief that the knowledge must relate to the particular misrepresentation alleged. In these cases, the alleged misrepresentations relate to specific loan pools underlying the certificates. Defendants' evidence, however, does not relate to the specific loans, but rather relates only to general problems with originations in the industry and risks in purchasing certificates. Thus, defendants have not provided evidence of knowledge of issues within the specific loan pools. For example, the credit unions' knowledge of general risks might support an inference that they knew these loan pools *might* contain defective loans (a risk of defects), but it does not support a reasonable inference that they actually *knew* that these specific loans *actually were* defective. Similarly, the credit unions' awareness that originators generally—or even the originators of these loans—were loosening underwriting standards or sometimes did not comply with underwriting guidelines does not support a reasonable finding that they actually knew

6

that these specific loans were not originated in compliance with the guidelines.[4]

Allowing defendants to rely only on generalized evidence of industry problems and risks would undermine the defense's requirement of *actual* knowledge instead of constructive knowledge, as defendants are arguing in essence that, based on the state of the industry, the credit unions *should have known* that these specific loans would have defects.  Such an argument also runs the risk of imposing a requirement that the purchaser have acted reasonably, although the law is clear that there is no reasonable reliance requirement.  Defendants chose to make the representations that they did concerning these loans, and purchasers should be able to rely on such representations (and on due diligence performed with respect to the loans), including to provide some assurance that the specific loans underlying the certificates satisfied certain standards despite problems in the industry generally.  Thus, defendants here must produce evidence tied to the specific loans in order to provide evidence of the credit unions' actual knowledge that these particular representations were false.

In this regard, the Court finds persuasive the thorough opinions by which Judge Cote reached the same conclusion in similar cases in New York.  *See FHFA v. UBS*

---

[4]Defendants argue that they may rely on circumstantial evidence of the credit unions' actual knowledge.  The Court agrees with that general proposition.  To defeat summary judgment, however, the circumstantial evidence must give rise to a reasonable inference that the credit unions had actual knowledge *of these particular misrepresentations*.  *See FHFA v. UBS Americas Inc.*, 2013 WL 3284118, at *15 (S.D.N.Y. June 28, 2013) (Cote, J.) (making this same point regarding circumstantial evidence).  Defendants' evidence does not meet that standard.

*Americas Inc.*, 2013 WL 3284118, at *14-19 (S.D.N.Y. June 28, 2013) (Cote, J.); *FHFA v. HSBC N. Am. Holdings Inc.*, 33 F. Supp. 3d 455, 476-91 (S.D.N.Y. 2014) (Cote, J.). Defendants have not identified any flaw in Judge Cote's reasoning; instead they merely argue that her conclusions are against the weight of authority. The supposedly contrary authority cited by defendants, however, is not particularly helpful. Those cases involve whether the issue of knowledge predominated for purposes of class certification, and thus those courts did not consider whether such generalized evidence as that on which defendants rely may provide sufficient evidence of actual knowledge relating to particular misrepresentations. *See UBS Americas*, 2013 WL 3284118, at *15 (distinguishing *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006), on this basis); *HSBC*, 33 F. Supp. 3d at 484 (same). In fact, in the appeal from one case cited by defendants, the Second Circuit seemingly rejected the proposition for which defendants cited the lower court opinion. *See New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Trust*, 477 F. App'x 809, 813 (2d Cir. 2012) (noting that although the defendants' generalized evidence of knowledge indicated that individual knowledge inquiries might be necessary, such evidence "surely would not have sufficed to prove each knowledge defense on the merits"), *aff'g New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160 (S.D.N.Y. 2011).

Defendants have not attempted to distinguish the present cases from the cases before Judge Cote. Nor have defendants attempted to explain how their evidence satisfies the standard applied by Judge Cote (and now adopted by this Court) that

requires evidence relating to the credit unions' knowledge of problems with these specific loans.  Therefore, the Court concludes that defendants have failed to provide evidence sufficient to create a genuine issue of material fact with respect to any defense based on the credit unions' knowledge.

Finally, defendants argue that such a motion for summary judgment is premature until the representations and their material falsity have been established (presumably at trial).  The Court rejects this argument.  As with any issue or defense, summary judgment on the knowledge defense may be granted if defendants are unable to produce sufficient evidence in support of that defense.  In making this ruling, the existence of materially false misrepresentations may be assumed, and defendants have not produced the required evidence.  Accordingly, summary judgment is appropriate at this time, and the Court grants the motion and awards judgment to plaintiff on any knowledge defense asserted by defendants in these actions.

## II.   Summary Judgment – Certain Limitations Defenses

In the related case involving RBS, the Court ruled that the limitations period imposed by the Extender Statute, 12 U.S.C. § 1787(b)(14), supplanted any other unexpired limitations or repose period; and that because the certificates in that case had been sold within three years of March 20, 2009, when plaintiff became conservator of U.S. Central, plaintiff's claims were not barred by the federal Securities Act's three-year statute of repose.  *See NCUAB v. RBS Sec., Inc.*, 900 F. Supp. 2d 1222, 1237-43 (D. Kan.

2012) (Rogers, J.).  This Court endorsed and applied those rulings in the present cases.
*See NCUAB v. Credit Suisse Sec. (USA) LLC*, 939 F. Supp. 2d 1113, 1124-25 (D. Kan.
2013) (Lungstrum, J.); *NCUAB v. UBS Sec., LLC*, 2013 WL 4736240, at *2 (D. Kan.
Sept. 3, 2013) (Lungstrum, J.).  The Tenth Circuit subsequently affirmed the Court's
rulings in *RBS*, and after the Supreme Court vacated and remanded for further
consideration, the Tenth Circuit reinstated its previous affirmance.  *See NCUAB v.
Nomura Home Equity Loan, Inc.*, 727 F.3d 1246 (10th Cir. 2013), *vacated and
remanded*, 134 S. Ct. 2818 (2014), *aff'd on remand*, 764 F.3d 1199 (10th Cir. 2014),
*cert. denied*, 135 S. Ct. 949 (2015).

In these cases, it is undisputed that the credit unions purchased the certificates
within five years of the date on which the particular credit union was placed into
conservatorship by plaintiff; and with respect to the certificates on which plaintiff asserts
federal claims, the certificates were offered or sold within three years of the
conservatorship date.  Based on the Court's prior rulings discussed above, plaintiff seeks
summary judgment on any affirmative defense based on the three-year federal statute of
repose or the five-year statute of repose applicable to the California and Kansas claims.
*See* 15 U.S.C. § 77m; Cal. Corp. Code § 25506; K.S.A. § 17-12a509(j)(2).

With respect to its state-law claims based on four particular certificates,[5] plaintiff
seeks summary judgment on any affirmative defense based on the applicable two-year

---

[5] ARMT 2007-2, CWALT 2007-OA6, INDX 2007-FLX3, and MARM 2007-HF1.

discovery limitations period.  *See* Cal. Corp. Code § 25506; K.S.A. § 17-12a509(j)(2). Plaintiff bases that portion of its motion on the fact that each of those certificates was sold within two years of the applicable conservatorship date (meaning that the credit unions must have discovered any claim within the limitations period).

In response to the motion, defendants have preserved their right to appeal the Court's prior rulings, but they do agree that, if those rulings (as affirmed by the Tenth Circuit) are applied here, summary judgment is appropriate as requested by plaintiff. Accordingly, the Court grants the motion and awards plaintiff judgment on defendants' limitations defenses to the extent requested in the motion.

### III.   __Summary Judgment – Due Diligence and Reasonable Care__

In separate motions in the two cases, plaintiff seeks summary judgment on any affirmative defenses of due diligence or reasonable care as asserted by defendants.  As set forth more fully below, the motions are granted in part and denied in part.

#### A.   *Statutory Issuers*

Plaintiff has asserted claims only under federal Section 11 against defendant MASTR (in *UBS*) (based on eight certificates from five securitizations) and defendant CSFB (in *Credit Suisse*) (based on seven certificates from five securitizations).  Plaintiff seeks summary judgment on any due diligence defense asserted by those defendants on the basis of Section 11's express exclusion of issuers from its affirmative due diligence defense.  *See* 15 U.S.C. § 77k(b).  Those defendants do not dispute that they acted as

issuers for purposes of Section 11, and they have not opposed summary judgment on the defense.  Accordingly, plaintiff's motion is granted with respect to defendants MASTR and CSFB, and plaintiff is awarded judgment on any due diligence or reasonable care defense asserted by those defendants.

## B.   *Reasonable Care Standard*

The Court then turns to plaintiff's motion as it relates to defendant UBS Securities, LLC (hereafter referred to as "UBS") and defendant Credit Suisse Securities (USA) LLC (hereafter referred to as "Credit Suisse").  In *UBS*, plaintiff's claims are based on 22 certificates from 11 securitizations underwritten by UBS.  The five principal securitizations were issued by an affiliate of UBS, while the six third-party securitizations were issued by an entity unrelated to UBS.  In *Credit Suisse*, plaintiff's claims are based on 20 certificates from 15 securitizations underwritten by Credit Suisse. The six principal securitizations were sponsored and issued by Credit Suisse's affiliates, and the underlying loans came from Credit Suisse's own inventory.  The remaining nine third-party securitizations were sponsored and issued by unaffiliated entities, and the loans came from banks other than Credit Suisse.  Plaintiff asserts claims against UBS and Credit Suisse under federal Section 11, federal Section 12(a)(2), and the blue-sky statutes of California and Kansas.

Each statute provides for a due diligence or reasonable care affirmative defense. Section 11 provides that a person shall not be liable if he sustains the burden of proof that "he had, after reasonable investigation, reasonable ground to believe and did

believe" that there was no false or misleading representation or omission. *See* 15 U.S.C. § 77k(b)(3)(A). Section 11 further provides that "[i]n determining . . . what constitutes reasonable investigation and reasonable grounds for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property." *See id.* § 77k(c). Section 12(a)(2) provides for the liability of one "who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known," of the untruth or omission. *See id.* § 77*l*(a)(2). The relevant California statute provides for liability "unless the defendant proves . . . that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission." *See* Cal. Corp. Code § 25501. The relevant Kansas statute provides for liability if the seller does "not sustain[] the burden of proof that the seller did not know and, in the exercise of reasonable care, could not have known of the untruth or omission." *See* K.S.A. § 17-12a509(b).

Thus, each defense requires an application of a standard of reasonable care. The parties agree that the standard is thus essentially a negligence standard. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976) (Section 11's due diligence defense is in effect a negligence standard); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 & n.7 (2d Cir. 2010) (by virtue of affirmative defenses, defendants may be liable under Section 11 and Section 12(a)(2) for mere negligence); *see also NCUAB v. UBS Sec., LLC*, 2016 WL 7373857, at *3 (D. Kan. Dec. 20, 2016) (Lungstrum, J.) (interpreting California and Kansas statutes in a manner consistent with federal Section

12, after which those statutes were modeled).[6]

## C.   *Summary of Rulings and Preliminary Considerations*

As plaintiff concedes, the application of a standard of reasonable care ordinarily presents a question of fact for the jury.  In these cases, the application of the due diligence defense turns on a consideration of many disputed facts, including (but not limited to) facts concerning a reasonable investor's understanding of the representations in the offering documents; the nature and extent of the defendants' efforts to perform due diligence; the particular facts of which defendants had notice in performing due diligence, including the existence of any "red flags"; defendants' responses to any red flags; and defendants' relationships with and supervision of third parties assisting in the due diligence.  In addition, the competing opinions of the parties' expert witnesses on the subject of due diligence present factual disputes.  It is true, as plaintiff argues, that the application of a standard of reasonable care may result in summary judgment in the appropriate case.  These cases, however, do not involve an absence of evidence supporting the affirmative defenses; rather, plaintiff argues that when the evidence is weighed, no reasonable jury could find in favor of defendants on these defenses.  The

---

[6]By virtue of its "reasonable investigation" requirement, Section 11 would seem to impose a stricter standard of due diligence than Section 12(a)(2).  *See* SEC Release No. 75, 2005 WL 1692642, at *79 (Aug. 3, 2005) ("the standard of care under Section 12(a)(2) is less demanding than that prescribed by Section 11 or, put another way, . . . Section 11 requires a more diligent investigation than Section 12(a)(2)").  In general, however, the parties have not differentiated between the statutes in making their specific arguments, and the Court concludes, in ruling on these motions, that the same results are warranted under any of the statutes.

Court cannot agree. All evidence must be viewed in the light most favorable to defendants, and the Court cannot conclude that a reasonable jury, based on that evidence, could not find in favor of defendants on enough of these issues of fact to allow it to determine that defendants acted reasonably. Accordingly—except with respect to two securitizations, on which defendants essentially offered *no* evidence of due diligence—the Court concludes that genuine issues of material fact preclude summary judgment on these defenses.

Plaintiff relies heavily on *FHFA v. Nomura Holding America Inc.*, 68 F. Supp. 3d 439 (S.D.N.Y. 2014), *appeals pending*, Nos. 15-1872, 15-1874 (2d Cir.), in which Judge Cote awarded the plaintiff summary judgment on due diligence defenses in a similar case. *See id.* The Court's consideration of these defenses on summary judgment must depend on the particular facts in the cases before it, however, and the Court concludes that the viability of the defenses may not be decided as a matter of law in these cases. Thus, the Court reaches a different result than that reached by Judge Cote in a case involving different facts and evidence. *See Massachusetts Mutual Life Ins. Co. v. DB Structured Prods., Inc.*, 110 F. Supp. 3d 288, 300-01 (D. Mass. 2015) (respectfully declining to follow Judge Cote's approach, and concluding in a similar case that the reasonableness of due diligence efforts presented a question of fact for the jury). In that regard, the Court notes two significant differences between the evidence before this Court and the evidence before Judge Cote (although the differences are not limited to these two examples). First, UBS and Credit Suisse have supported their defenses with

expert opinions, while in *Nomura*, Judge Cote did not discuss any such expert due diligence evidence. *See* 68 F. Supp. 3d 439. Second, in concluding that kick-out rates for the underlying loans were too high and thus would be deemed red flags by a reasonable factfinder, Judge Cote relied on evidence that the defendant considered a certain rate to be typical, *see id.* at 479; in the present cases, however, no such benchmark evidence has been offered. Thus, in the present cases, whether certain kick-out rates constitute red flags presents a disputed question of fact for the jury.[7]

Plaintiff makes specific arguments about defendants' reliance on the opinions of their experts, Gary Lawrence and Charles Grice, concerning due diligence. For instance, plaintiff decries the experts' reference to industry standards and customs. The Court agrees that compliance with industry standards does not necessarily establish compliance with the reasonable care standard, as the entire industry may have been acting unreasonably (as plaintiff has alleged with respect to the residential mortgage industry during the relevant time period). Nevertheless, as even Judge Cote recognized, "[i]ndustry standards are relevant to the reasonableness inquiry." *See Nomura*, 68 F. Supp. 3d at 473; *accord Massachusetts Mutual*, 110 F. Supp. 3d at 300 (quoting *Nomura*). Thus, evidence of defendants' compliance with industry standards is properly considered in determining whether defendants have submitted sufficient evidence to create a question of fact for the jury. The Court also rejects plaintiff's argument that Mr.

---

[7]Another difference is that *Nomura* was ultimately tried to the court and not to a jury.

Grice improperly limited his opinions to compliance with industry standards, as Mr. Grice's did also opine that defendants acted reasonably with respect to their due diligence.[8]

Finally, in *Credit Suisse*, plaintiff has submitted additional evidence relating to a settlement with the Department of Justice in which Credit Suisse purportedly made certain admissions regarding its due diligence practices. Plaintiff has cited D. Kan. Rule 7.1(f) as the basis for its filing. That rule, however, provides for the submission of "supplemental citations" to "pertinent and significant authorities" that have come to the party's attention post-briefing. *See id.* Thus, the rule is intended to allow for the citation of new legal authority. Plaintiff seeks only to submit new factual evidence, without having sought leave to amend or supplement its summary judgment motion. Accordingly, the Court has not considered the additional evidence submitted by plaintiff.

### D.    *Principal Securitizations*

#### 1.    CONTROL OF ISSUER

With respect to the principal securitizations, plaintiff argues that a higher standard should be applied—at least under Section 11—because the issuers in those offerings were affiliated with or controlled by UBS and Credit Suisse. Plaintiff relies on *Nomura*, in which Judge Cote stated that in such circumstances, "where the issue is the creature of the underwriter, the underwriter's Section 11 liability approaches that of the issuer as

---

[8]As set forth below, *see infra* Part IV, the Court denies plaintiff's motion to exclude expert testimony by Messrs. Lawrence and Grice.

guarantor of the accuracy of the prospectus and a due diligence defense will fail in practically all cases of misrepresentation." *See Nomura*, 68 F. Supp. 3d at 471 (internal quotations and footnote omitted) (quoting *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 578 (E.D.N.Y. 1971)).  Thus, plaintiff seeks to impose a standard approaching absolute liability for these securitizations.

The Court rejects this argument.  *Feit*, on which Judge Cote relied for this statement, did not involve an RMBS or similar security, but rather involved a traditional security based on the performance and value of the issuing company.  *See Feit*, 332 F. Supp. 544.  The court in *Feit* concluded that because an inside director has intimate knowledge of his company's affairs and transactions, his liability approaches that of the issuer as guarantor.  *See id.* at 578.  In the present cases, however, the securities are based not on the value of the issuer, but rather on the value of the underlying loans.  Thus, the originators of the loans are most analogous to the issuers of traditional securities, and defendants' relationship with the issuers in these cases is not as relevant.  *See Massachusetts Mutual*, 110 F. Supp. 3d at 299 (relying on this same reasoning in rejecting the plaintiff's argument that the defendant underwriter had a greater due diligence requirement because it was financially intertwined with the issuer).  Certainly, the particular positions held by defendants in relation to the other players may be considered by the jury in determining whether defendants acted reasonably.  *See* 17 C.F.R. § 230.176 (relevant circumstances in determining whether conduct was reasonable under Section 11 include the type of issuer, the type of security, and the role

of the particular person as underwriter).  The statutes, however, do not limit this defense as applied to an underwriter depending on its relationship to the issuer.  The Court thus does not agree that the standard as stated by the court in *Nomura*—a standard that would approach absolute liability—applies to the principal securitizations at issue here.

### 2.    TIMING OF DUE DILIGENCE

In asserting these defenses, defendants generally rely on loan-level due diligence conducted at the time the loans were acquired.  Plaintiff argues, in essence, that such due diligence is per se unreasonable because the due diligence was not conducted specifically for the purpose of confirming the accuracy of representations in the offering documents for the (later) securitization.   In that regard, plaintiff argues that the employees responsible for defendants' pre-acquisition due diligence differed from those involved with the subsequent securitizations; that the former set of employees did not consider the forthcoming representations in performing that due diligence; and that the latter set of employees did not consider the due diligence results in selecting loans to underlie the securitizations.

The Court concludes that this timing of the due diligence does not provide a basis to reject these defenses as a matter of law.  Judge Cote observed that an acquisition-stage review could be sufficient to allow a reasonable jury to find that the due diligence standard has been met.  *See Nomura*, 68 F. Supp. 3d at 445.  Judge Cote concluded that such a review was not sufficient in that case, however, because the defendant broke the link between the acquired pools of loans and the loans selected for the securitizations by

selecting those loans not randomly, but based on certain loan characteristics. *See id.* at 475. Judge Cote relied on her conclusion that such a selection could have caused the defendant to bundle defective loans together in a securitization. *See id.* Judge Cote did not provide any basis for that surmise, however. *See id.* Without a thorough analysis of defendants' selection[9] of the loans for the securitizations at issue in the present cases (plaintiff has not indicated that it undertook any such analysis here), this Court cannot assume that selecting loans by reference to certain loan characteristics necessarily means that there is a high risk that defective loans have been selected—indeed, the incidence of defective loans could just as well be lower than that found at the acquisition, and there is no basis to assume that the selection was riskier than a random selection.

Moreover, as defendants point out with respect to the timing, the use of acquisition-stage due diligence does make some logical sense, for the reason that such reviews were testing compliance and characteristics as of the time of the loan origination—a point in time closer to the acquisition stage than to the securitization stage. *See Massachusetts Mutual*, 110 F. Supp. 3d at 300. In addition, defendants' experts sanctioned that timing, which was in accord with industry custom. *See id.* Plaintiff suggests that new information could have arisen between the acquisition and securitization stages, but the likelihood of that occurring presents a question of fact. *See id.* ("Plaintiff has not demonstrated that the Acquisition Diligence was stale as a matter

---

[9]Plaintiff has asserted this argument about the bundling of defective loans only with respect to UBS.

of law."). It is for the jury to weigh the pros and cons concerning the timing of defendants' due diligence practices. Plaintiff also complains that the acquisition-stage due diligence was not directly intended to verify the representations that subsequently appeared in the offering documents for the securitizations. The representations at issue here, however, concern compliance with underwriting guidelines and the characteristics of the loans, and the jury could reasonably conclude that those issues were sufficiently covered by the acquisition stage loan-level review performed by defendants. For these reasons, the Court does not agree with plaintiff that defendants' reliance on acquisition-stage due diligence dooms their defenses as a matter of law.

The Court reaches the same conclusion with respect to defendants' due diligence programs and processes. The fact that different sets of employees may have been responsible for due diligence and for the securitizations does not mean that the due diligence was unreasonable as a matter of law. For example, Credit Suisse has presented evidence that it employed due diligence processes at the time of securitization as well as at acquisition, while UBS has cited to evidence that its securitization group reviewed and used the due diligence results. The Court also concludes that UBS's lack of written due diligence policies does not mean that UBS acted unreasonably as a matter of law, as a jury could reasonably conclude that UBS properly allowed its due diligence personnel to exercise their judgment on an ad hoc basis. The Court also rejects plaintiff's argument that UBS's due diligence deadlines and resources were insufficient as a matter of law. Ultimately, the manner in which defendants conducted their due

diligence—and whether such processes were reasonable—present questions of fact for the jury.

### 3.  SAMPLING OF LOANS

Plaintiff also argues that defendants' sampling of the loan pools in conducting due diligence was unreasonable as a matter of law.  With respect to some pools of loans from which the loans underlying the certificates were drawn, defendants relied on reviews of sample sets of loans.  Plaintiff complains that defendants, instead of simply selecting random sets of loans for sampling, first selected "adverse" sets of loans for sampling based on certain characteristics.  Plaintiff argues that because the selection was not random, the results from the sampling could not be extrapolated to the unsampled loans in a scientifically valid way.  The Court concludes that this method of sampling presents a question of fact for the jury.  Defendants' evidence indicates that the adverse sampling was intended to test first those loans with the greatest risk of being defective; thus, there could have been a reasonable basis for defendants to believe that the unsampled loans were no worse (and were likely better) than the sampled loans with respect to the incidence of defects.  Moreover, defendants' experts opined that some conclusions could be drawn concerning the unsampled loans and that the use of adverse sampling was customary and reasonable.

Plaintiff also argues that the sampling was often conducted before the loan pools were completely filled, which would allow for defective loans to added later to avoid the sampling process.  Defendants provided evidence, however, that later-added loans were

reviewed for consistency with the initial pools.  Again, this issue presents a question of fact for the jury.

In challenging the sampling, plaintiff appears to contend (without authority) that defendants acted unreasonably in relying on any sampling.  Plaintiff argues that the offering documents did not represent that there would be defective loans underlying the securitizations, but rather represented that *all* loans would be originated in compliance with underwriting guidelines.  How a reasonable investor would understand the documents, however, presents a disputed question of fact.  For instance, defendants note that the offering documents also contained representations indicating that there could be borrower fraud or or that there could be defective loans.  Plaintiff has never argued that the presence of a single defective loan could mean a material misrepresentation.  Defendants' experts have stated that sampling was appropriate here; and the SEC has stated that the standard for due diligence is flexible, that a particular type of due diligence is not required, and that sampling may be appropriate, including with respect to RMBS.  *See* SEC Release No. 9176, 2011 WL 194494, at *5-6 (Jan. 20, 2011).  The Court thus rejects any argument that defendants acted unreasonably as a matter of law because they did not review every loan.

Plaintiff argues that defendants acted unreasonably in relying on third-party vendors to perform the loan-level review.  Plaintiff notes that defendants regularly allowed loans graded as EV3 (the worst grade) to be included in the securitization pools after a further review (including a review for the presence of compensating factors), but

that defendants did not also review EV1 and EV2 grades for accuracy. That is an argument that can be made to the jury, however. Defendants' experts opined that such reliance by defendants was customary and reasonable, and even plaintiff's due diligence expert conceded that he rarely second-guessed the review by such vendors. Concerns about the adequacy of the vendors (including the fulfillment centers used by Credit Suisse[10]) also present questions of fact for trial.

Plaintiff also challenges defendants' due diligence practices with respect to pools or securitizations in which *all* of the loans were reviewed, with no sampling at all.[11] The Court concludes that the review of every loan (with all defective loans removed from the pools) provides sufficient evidence from which a jury could reasonably find that the defendant acted reasonably with respect to that pool or securitization.[12]

4.     RED FLAGS

---

[10]Viewed in the light most favorable to Credit Suisse, the testimony by Eddie Othman, who oversaw the fulfillment centers for Credit Suisse, does not establish that work performed by those centers could not constitute loan-level due diligence. Moreover, the parties' dispute concerning the probative value of the spreadsheets produced by Credit Suisse concerning the fulfillment centers' results presents a question for the jury.

[11]There is evidence that every loan from the pools acquired by Credit Suisse from its conduit channel, was reviewed, as was every loan in many of Credit Suisse's bulk channel pools. With respect to UBS, every loan underlying the MABS 2006-HE4 securitization was reviewed.

[12]The Court agrees with Credit Suisse that the fact that approximately 89 percent of the loans underlying the Credit Suisse principal securitizations were reviewed provides sufficient evidence from which the jury could reasonably conclude that Credit Suisse acted reasonably with respect to its due diligence from those securitizations.

The Court also concludes that the existence of red flags and whether defendants responded appropriately to any such red flags present questions of fact for the jury. Plaintiff argues that defendants failed to "upsize" their sample pools or to take other measures despite seeing high "kick-out" or failure rates in the sampled loans. Plaintiff relies on its expert's calculations of weighted failure-rate averages of 16.2 percent for the loans from Credit Suisse's bulk channel pools and 12.0 percent across UBS's sampled principal securitizations.[13] But as defendants point out, plaintiff's expert merely counted the incidence of EV3 grades, without considering the reasons for those grades. Thus, those figures also include examples in which the loan failed the defendant's own stricter underwriting guidelines instead of the originator's guidelines (an "overlay"); the loan file was missing documentation, which defect could be cured; and compensating factors trumped the violation of a particular guideline. Accordingly, the failure rates cited plaintiffs are not necessarily accurate with respect to the percentage of sampled loans that violated originators' guidelines without compensating factors. The proper percentage presents a question of fact for the jury.

Moreover, even if the relevant percentages could be determined as a matter of law, there would remain a factual dispute concerning whether those percentage were too high to give defendants reasonable comfort about the accuracy of their offering

---

[13]The Court has reviewed defendants' motion to exclude such opinions by plaintiff's expert, and it will rule on that motion in a separate order. The Court's summary judgment ruling does not depend on the outcome of the motion to exclude.

document representations.  In *Nomura*, Judge Cote compared certain failure rates against a typical rate (7-8%) stated in the defendant's communications.  In the present cases, however, there is no such evidence of a typical or acceptable rate against which to compare the rates calculated by plaintiff's expert.  In *Credit Suisse*, plaintiff cites evidence that, in one transaction not at issue here, a Credit Suisse manager asked that a sample be increased until the EV3 rate was at five percent or less.  There is no evidence, however, that that instruction on an unrelated transaction represented a policy at Credit Suisse that applied to these securitizations.  That evidence therefore does not establish a policy or a typical rate as a matter of undisputed fact.  Defendants also rely on expert testimony that they acted reasonably.  Accordingly, this question of "how high is too high" remains for the jury.[14]

The post-acquisition red flags argued by plaintiff also present questions of fact for trial.  Plaintiff notes that in random quality control samples taken by Credit Suisse, 41.1 percent of loans had "critical" issues.  Credit Suisse has cited testimony, however, that "critical" did not necessarily mean that underwriting guidelines had been violated, and that Credit Suisse was applying its own (possibly more strict) guidelines instead of the original underwriting guidelines at any rate.  Moreover, Credit Suisse presented at

---

[14]For the same reasons, the Court concludes that a question of fact for trial remains concerning whether defendants acted reasonably in response to evidence of a particular incidence of valuation concerns.  Plaintiff also points to the number of waived conditions relating to the review of Credit Suisse's conduit channel loans, but as noted above, all such loans were reviewed, and the jury could therefore reasonably find that Credit Suisse performed reasonable due diligence for those loans.

least some evidence that it did respond to those results.  The significance of this review is therefore for the jury to determine.  Similarly, the jury may decide what weight to give the fact that one bank rejected 21 percent of loans offered to it by Credit Suisse based on underwriting defects, a few of which loans landed in the securitizations.  Finally, plaintiff cites to an internal UBS audit that identified due diligence concerns, but the fact that the audit also concluded that UBS's due diligence was satisfactory creates a question of fact for the jury.

### E.   *Third-Party Securitizations*

#### 1.   AS LEAD UNDERWRITER

Plaintiff also challenges defendants' due diligence with respect to securitizations for which they acted in the position of lead underwriter.  Plaintiff notes that the sample sizes were even smaller for these loans.  For the same reasons cited above with respect to the principal securitizations, however, the Court concludes that the reasonableness of defendants' due diligence presents a question of fact for the jury.

The Court also rejects plaintiff's arguments for a ruling as a matter of law on the reasonableness of UBS's due diligence concerning the MARM 2007-HF1 securitization, which included loans originated through an affiliate, UBS Home Finance.  UBS's expert found this due diligence to be appropriate, and the Court cannot say as a matter of law that it was unreasonable to use an automated system for preliminary loan approval.  Poor results from after-the-fact reviews of these loans may provide evidence in plaintiff's favor, but a jury could nonetheless determine that UBS acted reasonably with respect to

this securitization.  The Court also rejects plaintiff's argument that UBS's defense suffers from a failure of proof because UBS did not provide evidence of the actual results of the loan-level reviews of the these loans.  The relevant question is the reasonableness of UBS's due diligence with respect to this securitization, and UBS has provided evidence relating to its process of due diligence.  The jury will decide whether UBS ultimately meets its burden of proof in this case.

2.      AS PARTICIPATING UNDERWRITER

Finally, plaintiff challenges defendants' due diligence with respect to certain securitizations in which defendants relied entirely on the due diligence performed by other underwriters.  In those cases, defendants argue that they were not the lead underwriter and that they appropriately relied on the lead underwriters' due diligence instead of duplicating those efforts.

In *Credit Suisse*, plaintiff argues that Credit Suisse was not entitled to act as a mere participating underwriting, relying solely on the lead underwriter, because the offering documents for the three relevant securitizations did not identify the other underwriters as "lead underwriters" to the exclusion of Credit Suisse.  Credit Suisse has provided evidence, however, that the other underwriters did perform due diligence as the lead underwriters.  The SEC has recognized that a participating (non-lead) underwriter may delegate to and rely on the lead underwriter to perform the necessary due diligence, and it need not duplicate the other's investigation, so long as that reliance is reasonable. *See* SEC Release No. 9671, 1972 WL 125474, at *6 (July 27, 1972).  There is no

28

authority for the position that all underwriters must perform full (and duplicative) due diligence if their positions as lead and participating underwriter are not expressly stated in the offering documents.  The Court thus rejects this argument by plaintiff based on the offering documents.

Nevertheless, the Court agrees with plaintiff that something more than blind reliance on the other's due diligence is required.  As noted by the SEC, "the participating underwriter's reasonable investigation burden may not be as heavy a burden as the managing underwriter's," *see id.*; but the statutes still require reasonable due diligence. As the SEC explained:

> This means that the participant may relieve himself of the task of actually verifying the representations in the registration statements, but that he must satisfy himself that the managing underwriter makes the kind of investigation the participant would have performed if he were the manager.  He should assure himself that the manager's program of investigation and actual investigation performance are adequate.   . . . Thus, although the participant may delegate the performance of the investigation, he must take some steps to assure the accuracy of the statements in the registration statement.  To do this, he at least should assure himself that the manager made a reasonable investigation.

*See id.*  Thus, the Court concludes that, to survive summary judgment, a defendant who has merely relied on the due diligence performed by another must be able to point to some evidence that it had notice of facts that would give it some comfort or assurance about the other's due diligence practices generally or its due diligence performance with respect to the particular securitization.  In the absence of such evidence, no reasonable jury could conclude that the defendant had a reasonable basis for its reliance on the other

and for its failure to perform any due diligence of its own.

The Court thus considers the particular securitizations at issue. With respect to the RASC 2007-EMX1 securitization, Credit Suisse has produced evidence that it received a document showing the lead underwriter's due diligence results; that it discussed due diligence in a pre-securitization telephone call with the lead underwriter; and that a certain committee (the SPOC committee) at Credit Suisse approved working with the lead underwriter in that transaction. With respect to the SAST 2006-3 securitization, Credit Suisse provided evidence that it participated in a pre-securitization telephone call with the lead underwriter in which due diligence was discussed. While such evidence may not be overwhelming, there is at least some evidence that Credit Suisse had knowledge relating to the lead underwriter's due diligence that would allow it to rely on the lead underwriter for those two securitizations. Moreover, Credit Suisse's expert opined that its reliance on the lead underwriters was customary and reasonable. The Court thus concludes that a question of fact remains for trial concerning Credit Suisse's defenses to the claims based on these two securitizations.

The Court cannot so conclude with respect to the INDYL 2006-L2 securitization. Credit Suisse has not produced any evidence that it received any due process results or had a telephone discussion with the lead underwriter for this securitization. Credit Suisse cites only its expert's reference to the SPOC committee, but in that section of his report, Mr. Grice stated that this securitization was *not* presented to that committee. Credit Suisse is left only with Mr. Grice's opinions that the lead underwriter's due

diligence was reasonable and that Credit Suisse reasonably relied on the lead underwriter to perform the due diligence.  Mr. Grice did not identify any basis, however, for any knowledge by Credit Suisse of either the lead underwriter's due diligence practices generally or the lead underwriter's practices and results with respect to this securitization.[15]  In the absence of such evidence, the Court concludes that no reasonable jury could find that Credit Suisse acted reasonably in blindly relying on another's due diligence; and that therefore, because Credit Suisse did not provide evidence that it performed any due diligence of its own, no reasonable jury could find that Credit Suisse exercised reasonable care with respect to the truth of the representations in the offering documents.  The Court thus grants plaintiff summary judgment on this defense as asserted by Credit Suisse with respect to the claim based on the INDYL securitization.

Similarly, the Court grants plaintiff summary judgment on this defense as asserted by UBS with respect to the claim based on the NAA 2006-AR4 securitization.  With respect to that securitization, UBS has only asserted that it relied on the due diligence performed by RBS, the lead underwriter, without any due diligence of its own.  In support of that reliance, UBS points to its expert, Mr. Lawrence, who opined that UBS's reliance on RBS in this instance was reasonable.  At his deposition, Mr. Lawrence was

---

[15]Although Mr. Grice noted specifically in his report that Credit Suisse had had a longstanding relationship with the lead underwriter who performed the due diligence for the RASC securitization, he made no such statement with respect to the INDYL securitization.

asked specifically about the bases for UBS's reliance on RBS's due diligence.[16]  In response, Mr. Lawrence identified only UBS's prior dealings with RBS, RBS's "stature and standing" in the industry, and RBS's experience in dealing with RMBS.  Mr. Lawrence further testified that he had not seen any evidence either that UBS received or evaluated RBS's due diligence with respect to this securitization or that UBS had previously examined RBS's due diligence for similar RMBS securities.  UBS also provided evidence in opposition to summary judgment that UBS had previously been a participating underwriter is eight RBS-led deals.

The Court concludes that this evidence is not sufficient to create a genuine issue of material fact on this defense.  UBS and Mr. Lawrence pointed to previous dealings with RBS, but there is no evidence that UBS became familiar with or discussed RBS's due diligence practices in the course of those dealings.  UBS and Mr. Grice also point to RBS's "stature" and experience.  The fact that RBS was a large company and had experience in this kind of securitization, however, says nothing about its due diligence practices and whether those practices were reasonable.[17]  Indeed, if UBS had ever been

---

[16]At the deposition, Mr. Lawrence was confronted with an excerpt from his own book, in which he had noted the SEC's acknowledgment that a participating underwriting could delegate the investigation to the lead underwriter, although the participant must satisfy himself that the lead underwriter makes the kind of investigation that the participant would.

[17]Indeed, in lawsuits culminating in adverse rulings and settlements, *see, e.g.*, *Nomura*, 68 F. Supp. 3d at 481-84, RBS's due diligence practices have been called into serious question.

exposed to RBS's due diligence practices, it should not have been difficult to produce evidence to that effect, but UBS has not done so.  Thus, there is no evidence from which a reasonable jury could find that UBS had a reasonable basis for relying on RBS's due diligence with respect to this securitization, and plaintiff's motion is granted accordingly.

### IV.      Motion to Exclude – Lawrence and Grice

By a single motion filed in both cases, plaintiff seeks to exclude testimony by defendants' due diligence experts, Gary Lawrence and Charles Grice.  Plaintiff argues that those experts' opinions lack the requisite "fit" and are irrelevant because the experts have assumed a particular interpretation of the offering documents that would allow for the securitizations to include some subset of loans (not necessarily limited to an immaterial number) that do not comply with the originators' guidelines and do not contain sufficient compensating factors.  Plaintiff argues that the offering documents should be interpreted as a matter of law to mean that *all* loans, except for an immaterial number, strictly complied with originator guidelines or had sufficient compensating factors.  Plaintiff argues that because the experts assumed an incorrect interpretation, their opinions should be excluded.

The Court in its discretion denies the motion to exclude.  First, as the Court has ruled previously, the proper interpretation of the representations in the offering documents presents a question of fact for the jury.  *See NCUAB v. UBS Sec., LLC*, 2017 WL 235013, at *7, 9 (D. Kan. Jan. 19, 2017) (Lungstrum, J.).  The Court concludes that

a reasonable jury could interpret the offering documents to allow for some non-compliant loans.  Thus, exclusion of the experts' opinions at this time for their purported failure to adhere to plaintiff's interpretation is not warranted.   Second, even under plaintiff's interpretation (which does allow for some non-compliant loans, albeit an "immaterial number" of them), these experts opinions could be relevant and helpful to the jury's determination of due diligence, which turns on the reasonableness of defendants conduct.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiff's motion for summary judgment on certain defenses (Doc. # 442 in *UBS*, Case No. 12-2591; Doc. # 401 in *Credit Suisse*, Case No. 12-2648) as it relates to defendants' knowledge defenses and certain of defendants' limitations defenses is **granted**, and plaintiff is awarded judgment on those defenses as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiff's motion for summary judgment on UBS's due diligence and reasonable care defenses (Doc. # 435 in *UBS*, Case No. 12-2591) is **granted in part and denied in part**.  The motion is granted with respect to defendant Mortgage Asset Securitization Transactions, Inc. (MASTR) and with respect to the NAA 2006-AR4 securitization, and plaintiff is awarded judgment to that extent.  The motion is otherwise denied.

IT IS FURTHER ORDERED THAT plaintiff's motion for summary judgment on Credit Suisse's due diligence and reasonable care defenses (Doc. # 393 in *Credit Suisse*, Case No. 12-2648) is **granted in part and denied in part**. The motion is granted with respect to defendant Credit Suisse First Boston Mortgage Securities Corp. (CSFB) and with respect to the INDYL 2006-L2 securitization, and plaintiff is awarded judgment to that extent. The motion is otherwise denied.

IT IS FURTHER ORDERED THAT plaintiff's motion to exclude expert testimony by Gary Lawrence and Charles Grice (Doc. # 419 in *UBS*, Case No. 12-2591; Doc. # 383 in *Credit Suisse*, Case No. 12-2648) is **denied**.

IT IS SO ORDERED.

Dated this 31st day of January, 2017, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge